UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

D.A., a minor, by and through his
mother B.A.; and X.A., a minor, by and
through his mother B.A,

        Plaintiffs,                  Judge Paul L. Maloney
                                  Magistrate Judge Sally J. Berens

v                                    No. 23-423

TRI COUNTY AREA SCHOOLS, ANDREW
BUIKEMA and WENDY BRADFORD,

        Defendants.

_____/

| | |
|---|---|
| Conor T. Fitzpatrick (P78981) | Timothy J. Mullins (P28021) |
| Kelley Bregenzer | Kenneth B. Chapie (P66148) |
| Foundation for Individual Rights and | John L. Miller (P71913) |
|   Expression | Annabel F. Shea (P83750) |
| *Attorneys for Plaintiffs* | Giarmarco, Mullins & Horton, P.C. |
| 510 Walnut St., Ste. 1250 | *Attorneys for Defendants* |
| Philadelphia, PA 19106 | 101 W. Big Beaver Road, 10th Floor |
| (215) 717-3473 | Troy, MI 48084-5280 |
| conor.fitzpatrick@thefire.org | (248) 457-7020 |
| kelley.bregenzer@thefire.org | tmullins@gmhlaw.com |
| | kchapie@gmhlaw.com |
| | jmiller@gmhlaw.com |
| | ashea@gmhlaw.com |

**DEFENDANTS, TRI COUNTY AREA SCHOOLS, ANDREW BUIKEMA and WENDY
BRADFORD'S MOTION FOR SUMMARY JUDGMENT**

1

**TABLE OF CONTENTS**

CONCISE STATEMENT IN SUPPORT OF DEFENDANTS' POSITION ........................ vii

TABLE OF AUTHORITIES ........................................................................................... iii

STATEMENT OF ISSUES PRESENTED ...................................................................... ix

STATEMENT OF FACTS ............................................................................................... 1

1.      Background ........................................................................................................ 1

        a.      The Origin of the "Let's Go Brandon" Slogan .................................... 1

2.      D.A. and X.A.'s Interactions with Buikema and Bradford ............................ 2

        a.      D.A.                   .................................................................................... 2

        b.      X.A.                   .................................................................................... 3

3.      The Dress Code               .................................................................................... 3

        a.      Clothing with a Profane Message is Prohibited Under the Dress Code ............ 4

        b.      Clothing that Expresses a Political Viewpoint is Permitted Under the
                Dress Code              .................................................................................... 4

        c.      "Let's Go Brandon" Apparel .......................................................................... 5

LEGAL STANDARD ...................................................................................................... 5

LAW AND ARGUMENT ...............................................................................................

        I.      PLAINTIFFS' LAWSUIT SHOULD BE DISMISSED FOR LACK OF
                JURISDICTION.         ............................................................................... 6

        II.     BUIKEMA AND BRADFORD ARE ENTITLED TO QUALIFIED IMMUNITY. .... 6

                A.      Plaintiffs Cannot Establish a First Amendment Violation .................. 7

                B.      Plaintiffs Cannot Establish that the Rights at Issue were Clearly
                        Established             ............................................................................... 15

III. PLAINTIFFS' *MONELL* CLAIMS AGAINST THE DISTRICT SHOULD BE
DISMISSED. .................................................................................16

    A. Plaintiffs' *Monell* Claims Fails Since They Did Not Establish a
Constitutional Violation. ...................................................................17

    B. Plaintiffs' *Monell* Claims Fail Since They Cannot Prove that the District is
Responsible for the Alleged Constitutional Violation. ...................17

        1. Plaintiffs Cannot Establish *Monell* Liability Based on the Existence
of an Illegal Official Policy...........................................................18
.

        2. Plaintiffs Cannot Establish *Monell* Liability Based on Buikema's
Decision to Regulate "Let's Go Brandon" Apparel Since He is
Not a Final Policymaker ................................................................20

        3. Plaintiffs Cannot Establish *Monell* Liability Based on a Policy of
Inadequate Training. .....................................................................23

        4. Plaintiffs Cannot Establish *Monell* Liability Based on the Existence
of an Illegal Practice or Custom. ..................................................24

IV.   PLAINTIFFS' CLAIMS FOR INJUNCTIVE AND DECLARATORY
RELIEF IN COUNTS III, IV, AND V SHOULD BE DISMISSED....................27

    A. Plaintiffs Lack Standing to Bring a Claim for Injunctive and Declaratory
Relief Based on the Existence of a Ban on "Let's Go Brandon" Apparel........27

    B. Plaintiffs' Lack Standing to Challenge a Portion of the Dress Code
that Buikema Did Not Rely On........................................................28

    C. The Alleged Offending Language in the Dress Code Was Removed,
Rendering Plaintiffs' Overbroad and Vague Claims Moot.............29

CONCLUSION................................................................................30

## TABLE OF AUTHORITIES

*Adkins v. Bd. Of Educ. Of Magoffin County, Ky.*, 982 F.2d 952 (6th Cir. 1993) ..............20,21

*Aldini v. Johnson*, 609 F.3d 858 (6th Cir. 2010) ........................................6

*Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988 (6th Cir. 2017) ....................24

*Ashton v. Okemos Public Schools*, __F.Supp.3d__, 2024 WL 503972, at *14
(W.D. Mich. Feb. 9, 2024) ................................................................17

*Barr v. Lafon*, 538 F.3d 554 n. 7 (6th Cir. 2008) ........................................11

*Bench Billboard Company v. City of Cincinnati*, 675 F.3d 974 (6th Cir. 2012) ...............29,30

*Berry v. City of Detroit,* 25 F.3d 1342 (6th Cir. 1994) ........................................23

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) ................................ vii,7,8

*Binelli v. Charter Tp. Of Flint*, 488 F. App'x 95 (6th Cir. 2012) ...........................22

*Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465(6th Cir. 2000), cert. denied,
532 U.S. 920 (2001) .................................................................10,11,12,13,14,16

*Brandywine Inc. v. City of Richmond*, 359 F.3d 830 (6th Cir. 2004) ......................................30

*Broad of Cty. Commissioners of Bryan Cty. v. Brown*, 520 U.S. 397 (1997) ........................24

*Boulton v. Swanson*, __F. Supp.3d__, 2014 WL 4601958 (E.D. Mich. Sept. 15, 2014) .........19

*Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622 (6th Cir. 2011) ........................................25

*Brown v. Trenton*, 867 F.2d 318 (6th Cir. 1989) ...........................................1,19,24

*Buke v. Barnes*, 479 U.S. 361 (1987) ...............................................27

*Castorina ex rel. Rewt. v. Madison County School Bd.* 246 F.3d 536 (6th Cir. 2001) ............11

*Cherry v. Pickell*, 188 Fed. App's 465 (6th Cir. 2006) ........................................19

*Citizens for a Strong Ohio v. Marsh*, 123 Fed. Appx. 630 (6th Cir., Jan. 3, 2005) .................6

*Citizens in Charge, Inc. v. Husted*, 810 F.3d 437 (6th Cir. 2016) ...........................................15

*City of Canton v. Harris*, 489 U.S. 378 (1989) ........................................................................23

*City of Los Angeles, v. Lyons*, 461 U.S. 95 (1983) ..................................................................28

*Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288 (1984) ...........................................7

*Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001) ..............................................................15

*Connick v. Thompson*, 131 S. Ct. 1350 (2011) ........................................................................25

*Crabbs v. Scott*, 800 Fed. Appx. 332 (6th Cir. 2020) ..............................................................18

*Curry ex. rel. Curry v. Sch. Dist. of City of Saginaw*, 452 F. Supp. 2d 723
(E.D. Mich. 2006) ......................................................................................................................24

*D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014) .........................................................16,18

*District of Columbia v. Wesby*, 583 U.S. 48, 138 S.Ct. 577 (2018) .......................................15

*Doe v. Caliborne Cnty.*, 103 F.3d 495 (6th Cir. 1996) ............................................................17

*Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir. 1993) .................................................21

*Fieger v. Mich. Sup. Ct.*, 553 F.3d 955 (6th Cir. 2009) ..........................................................27

*Fraser*, 478 U.S. at 683-85 ............................................ vii,ix,7,8,9,10,11,13,14,15,16,18,19,26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000) ..............................27

*Gregory v. Shelby Cnty.*, 220 F.3d 433 (6th Cir. 2000) .......................................................24,25

*Grendell v. Ohio Supreme Court*, 252 F.3d 828 (6th Cir. 2001) .............................................27

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ....................................................7,9

*Hilliard v. Walker's Party Store, Inc.*, 903 F.Supp. 1162 (E.D. Mich. 1995) ........................23

*Hunter v. Bryant*, 502 U.S. 224 (1991) ...................................................................................15

*Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989) ............................................................20

*Killinger v. Johnson*,  389 F.3d 765 (7th Cir. 2004) ...............................................................21

*Kinkus v. Vill. Of Yorkville, Ohi*o, 289 F. App'x 86 (6th Cir. 2008) ......................................17

*Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*,
69 F.4th 350 (6th Cir. 2023) .......................................................................................................7

*Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir. 1997) .................................................29

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................................27

*Mahonoy Area Sch. Dist. v. B.L. ex rel Levy*, 141 S. Ct. 2038 (2021) .....................................7

*Malley v. Briggs*, 475 U.S. 335 (1986) ......................................................................................6

*Mann v. Helmig*, 289 Fed. Appx. 845 (6th Cir. 2008) ........................................................17,18

*Midwest Media Prop., L.L.C. v. Symmes Twp.*, 503 F.3d 456 (6th Cir. 2007) .......................28

*Morse v. Frederick*, 551 U.S. 393 (2007) ......................................................................7,10,13

*Miller v. Calhoun County*, 408 F.3d 803 (6th Cir. 2005) ........................................................21

*Mitchell v. Schlabach*, 864 F.3d 416 (6th Cir. 2017) ..............................................................15

*Monell v. Dept't of Soc. Servs.*, 436 U.S. 658 (1978) ...............................16,17,18,20,23,24,25

*Mullenix v. Luna*, 577 U.S. 7 (2015) .......................................................................................15

*Napier v. Madison County, Kentucky*, 238 F.3d 739 (6th Cir. 2001) ......................................24

*National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272 (6th Cir. 1997) .....................................27

*Nat'tl Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*, 886 F.2d 1240
(10th Cir. 1989) ...........................................................................................................................6

*Neague v. Cynkar*, 258 F.3d 504 (6th Cir. 2001) ......................................................................6

*O'Shea v. Littleton*, 414 U.S. 488 (1974) ............................................................... 28

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................... 7

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ......................................... 20,23

*St. John v. Hickey*, 411 F.3d 762 (6th Cir. 2005) ................................................... 23

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ................................. 27

*Stevens-Rucker v. City of Columbus,* 739 F. App'x 834 (6th Cir. 2018) ................ 15

*Tini Bikinis-Saginaw, LLC v. Saginaw Charter Tp.*, 836 F. Supp. 2d 504
(E.D. Mich. 2011) .................................................................................................. 30

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .......... 7,8,9,10,11,13,14,19

*Warshak v. U.S.*, 532 F.3d 521 (2008) ..................................................................... 27

*Watkins v. City of Battle Creek*, 273 F.3d 682 (6th Cir. 2001) .............................. 17

*White v. Pauly*, 580 U.S. 73 (2017) ........................................................................ 15

*Wright v. City of Euclid, Ohio*, 962 F.3d 852 (6th Cir. 2020) ............................... 18

## State Statutes

MCL 380.11a ............................................................................................................ 22

MCL 380.381 ........................................................................................................... 22

MCL 380.384 ........................................................................................................... 22

## Federal Statutes

Fed. R. Civ. P. 56(c) ................................................................................................. 5

Fed. R. Civ. P. R. 10(a) ............................................................................................ 6

USC § 1983 .......................................................................................................... 16,17

**CONCISE STATEMENT IN SUPPORT OF DEFENDANTS' POSITION**

This case stems from two middle school students', D.A. and X.A., claim that public schools do not have the authority to prohibit students from wearing clothing that contain messages with a profane meaning under the First Amendment. More specifically, Plaintiffs claim that Defendants violated their First Amendment rights when Plaintiffs were asked to remove their "Let's Go Brandon" apparel at school in the Spring of 2022.

Plaintiffs' specifically claim: (1) that Defendants Andrew Buikema and Wendy Bradford violated their First Amendment rights when requesting that they remove their "Let's Go Brandon" sweatshirts at school, (2) that Buikema and Bradford acted pursuant to an official policy, practice, or custom warranting *Monell* liability against Tri County Area Schools, (3) they are entitled to injunctive and declaratory relief for Tri County Area Schools' alleged prohibition on "Let's Go Brandon Apparel", and (4) that they are entitled to injunctive and declaratory relief for the dress code's prohibition on apparel that is "disruptive to the teaching and/or learning environment by calling undue attention to oneself" which Plaintiffs allege is unconstitutionally vague and overbroad. Defendants are now filing the instant Motion for Summary Judgment.

Plaintiffs' lawsuit should be dismissed on summary judgment since Defendants are entitled to judgment as a matter of law as to each of the above claims. First, this Court lacks jurisdiction over this case since Plaintiffs have never sought prior approval to proceed anonymously. Second, under *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), Buikema and Bradford acted according to their authority in prohibiting speech that would be considered "profane" for minors as such speech is contrary to the mission of public schools. Because of this, Plaintiffs cannot establish a constitutional violation as a matter of law. Third, because Plaintiffs cannot establish a constitutional violation, they similarly cannot establish a Section 1983 claim against the District

under *Monell*. Fourth, Plaintiffs lack standing to seek declaratory and injunctive relief regarding the District alleged ban on "Let's Go Brandon" apparel. There has never been a District authorized ban. So there is no actual present harm or significant possibility of future harm. Lastly, Plaintiffs claim premised on the alleged unconstitutionally vague and overbroad language in the dress code is moot. On March 11, 2024, the Board of Education amended the dress code to remove the allegedly offending language.

## STATEMENT OF ISSUES PRESENTED

**Issue One:** A plaintiff's failure to seek permission to proceed anonymously deprives the court of jurisdiction to hear the case. Given that Plaintiffs failed to seek prior approval to proceed anonymously in this case, should this Court dismiss this case for lack of jurisdiction? **YES**

**Issue Two:** School officials are entitled to qualified immunity if the plaintiff cannot prove that the school officials violated a clearly established constitutional right. Given that Andrew Buikema and Wendy Bradford acted according to their authority under *Fraser* in prohibiting clothing with a profane message, should this Court grant them qualified immunity? **YES**

**Issue Three:** A *Monell* claim against a municipality fails when the plaintiff fails to establish an underlying constitutional violation. Given that Plaintiffs failed to establish that Andrew Buikema and Wendy Bradford violated X.A. and D.A.'s First Amendment rights, should this Court dismiss the *Monell* Claim against the District? **YES**

**Issue Four:** A plaintiff lacks standing to obtain declaratory and injunctive relief when there is no actual present harm or a significant possibility of future harm. Plaintiffs seek declaratory and injunctive relief based on the District's alleged ban of "Let's Go Brandon" apparel. Given that the District has never had a ban prohibiting "Let's Go Brandon" apparel, should Plaintiffs' claim for declaratory and injunctive relief be dismissed for lack of standing? **YES**

**Issue Five:** A claim is moot when the claim no longer presents a live case or controversy. Given that the District amended its dress code to remove the language that Plaintiffs' claim is

unconstitutional vague and overbroad, should this Court dismiss Plaintiffs' claims for declaratory and injunctive relief premised on such language, as moot? **YES**

**STATEMENT OF FACTS**

1.     **Background**

This First Amendment case is brought by two minor Plaintiffs, X.A. and D.A., by and through their mother, B.A., against Defendants, Tri County Area Schools, Andrew Buikema, and Wendy Bradford. More specifically, Plaintiffs claim that Defendants did not have the authority to prohibit them from wearing "Let's Go Brandon" sweatshirts to school even though the phrase means "**Fuck Joe Biden**."

Plaintiffs X.A. and D.A., are two minor brothers that attended Tri County Middle School during the 2021-2022 school year. Tri County Middle School is a part of Defendant Tri County Area Schools, ("the District"). Defendant Andrew Buikema ("Buikema") was the Assistant Principal of Tri County Middle School during the 2021-2022 school year. Defendant Wendy Bradford ("Bradford") was a science teacher at Tri County Middle School during the 2021-2022 school year.

a.     **The Origin of the "Let's Go Brandon" Slogan**

The slogan "Let's Go Brandon" is known to mean "Fuck Joe Biden." It originated from a NASCAR race that took place in October 2021, in Talladega, Alabama. Driver Brandon Brown won the race. Following the race, NBC Sports reporter, Kelli Stavast, was interviewing the winning driver. During the interview, the crowd was chanting "Fuck Joe Biden", however, the reporter indicating that the crowd was chanting "Let's Go Brandon" during her live television interview. (ECF No. 1, PageID 7). This reporter's comment went viral, and the slogan "Let's Go Brandon" was born. The video from the race is publicly available and can be viewed here: https://www.youtube.com/watch?v=_zUlhpaZkJw.

Both X.A. and D.A. testified that they both watched the above video. They also admitted that they knew that the slogan "Let's Go Brandon" means "Fuck Joe Biden".  (Ex. 1, p. 10-11; Ex. 2, p. 8). On December 25, 2021, X.A. and D.A. received "Let's Go Brandon" sweatshirts from their mother as a Christmas present. (Ex. 1, p. 11; Ex. 2, p. 8). Both X.A. and D.A. testified that they thought the implied profane message contained on the sweatshirts was comical. (Ex. 1, p. 11-12; Ex. 2, p. 9).

**2.      D.A. and X.A.'s Interactions with Buikema and Bradford**

Following receipt of their "Let's Go Brandon" sweatshirts, Plaintiffs D.A. and X.A. wore these sweatshirts to school in the Spring of 2022. These incidents are explained in more detail below.

**a.      D.A.**

Both D.A. and Buikema testified consistently about what occurred during their interaction. D.A. wore his "Let's Go Brandon" sweatshirt to Tri County Middle School in February of 2022. (Ex. 1, p. 12). In response, Buikema confronted D.A. about the sweatshirt, and asked D.A. if he knew what the phrase meant. (Ex. 1, p. 12; Ex. 3, p. 51, 67). D.A. said "no". Buikema testified that he then explained the profane meaning and told D.A. that he could not wear the sweatshirt at school. (Id). Buikema then asked D.A. to remove the sweatshirt because the slogan "Let's Go Brandon" means "Fuck Joe Biden" which is profane and violated the Dress Code. (Ex. 3, 51-53, 57-58, 65-66, 68). D.A. had a "Let's Go Brandon" t-shirt on underneath the sweatshirt. (Ex. 1, p. 12; Ex. 3, p. 67). He was then given another shirt to wear for the rest of the day. (Id.). D.A. was not disciplined since he complied with Buikema's request to remove the offending clothing. (Ex. 1, p. 12; Ex. 3, p. 67). During his deposition, D.A. admitted that he was not honest with Buikema,

and that **he knew that the phrase "Let's Go Brandon" meant "Fuck Joe Biden" at the time he wore the apparel in February of 2022**. (Ex. 1, p. 12).

D.A. then explained that he wore his "Let's Go Brandon" sweatshirt to school a few weeks later. (Ex. 1, p. 14). D.A. explained that he saw teacher Bradford in the hallway. (Id). D.A. stated that Bradford told him that he might want to take the sweatshirt off or go talk to an administrator. (Ex. 1, p. 14-15). D.A. admitted that Bradford did not order him to remove the sweatshirt and he was not disciplined for the interaction. This is consistent with Bradford's recollection of the interaction. (Ex. 4, p. 33-34).  Bradford testified that she was concerned with the fact that the message infers profanity since "Let's Go Brandon" means "Fuck Joe Biden." (Id. at 37). Bradford testified that based on her common sense and experience, clothing that contains a message that infers a curse word like "Fuck" is not school appropriate for middle school children. (Id. at p. 36-37).

  **b.**  **X.A.**

X.A. and Buikema testified consistently about what occurred during their interaction. X.A. wore his "Let's Go Brandon" sweatshirt to Tri County Middle School on one occasion in May of 2022. X.A. testified that he was called down to the front office to speak with Buikema. (Ex. 2, p. 10.). X.A. was then asked by Buikema to take off the sweatshirt because the slogan "Let's Go Brandon" means "Fuck Joe Biden" which is profane and violated the dress code. (Ex. 3, 51-53, 57-58, 65-66, 68). X.A. complied with the request. (Id). X.A. admitted that he was not disciplined for this incident. (Id).

**3.**  **The Dress Code**

Tri County School District's Board of Education adopted Policy 5511 concerning student dress and grooming. (Ex. 10).  The Policy directs the Superintendent to develop administrative

guidelines to implement this policy. (Id). Administrative Guideline 5511 implements Policy 5511, which states "[e]ach principal, in consultation with building staff, shall develop a dress code which complies with Board of Education Policy 5511." (Ex. 11). In accordance with the above policy and administrative guideline, the building administrators collaboratively worked with other District staff to develop a dress code, which is contained in the Student Handbook. (Ex. 3, p. 12, 13). The Student Handbook is provided to students at the beginning of each year. (Id.). The Student Handbook is not limited to the dress code and contains rules, guidelines, and student-related information. (Ex. 7, p. 20). The Elementary, Middle, and High Schools each have a different Student Handbook that is reviewed and updated annually.

As it relates to the dress code, the Middle School and High School have the same dress code. (Ex. 7, 26). Because of this, the Middle School and High School building administrators collaborate and work together to review the dress code on an annual basis. (Ex. 3, p. 14-15; Ex. 6, p. 14-15; Ex. 7, p. 21-22). Any proposed revisions are then submitted to the Board of Education for approval during an open Board meeting.  (Id).

    **a.**    **Clothing with a Profane Message is Prohibited Under the Dress Code**

During the 2021-2022 school year, the dress code applicable to Middle School and High School students prohibited "**[a]ttire with messages** or illustrations that are lewd, indecent, vulgar, **or profane**, or that advertise any product or service not permitted by law to minors." (ECF No. 1-2, PageID 46; ECF No. 1-3, PageID 62)(emphasis added).

    **b.**    **Clothing that Expresses a Political Viewpoint is Permitted Under the Dress Code**

There is no dispute that students at Tri County Middle School and High School are permitted to wear clothing that contained messages that are of a political nature or support a social cause. (Ex. 1, p. 15; Ex. 2, p. 11; Ex. 3, p. 19; Ex. 4, p. 11; Ex. 5, p. 18; Ex. 6, p. 18; Ex. 7, p. 29).

Clothing that expresses a particular political viewpoint has never been expressly prohibited under the dress code, nor has the dress code been interpreted to regulate particular political viewpoints based on the viewpoint alone. (Id.)

Each witness that provided testimony in this case, including Plaintiffs, testified that they commonly saw students wearing clothing to school that expresses a political viewpoint. (Id). Bradford testified that she has seen students wearing both pro-Biden and Trump shirts to school. (Ex. 4, p. 11). Williams testified that he has seen students wearing clothing that expressed a particular political viewpoint. (Ex. 5, p. 18).  Both X.A. and D.A. testified that they saw kids wearing apparel that was in support of President Trump such as "Make America Great Again" or "MAGA" apparel as well as apparel with a rainbow flag in support of LGBTQ+ pride. (Ex. 1, p. 15; Ex. 2, p. 11).

       c.      **"Let's Go Brandon" Apparel**

There has never been an express policy or custom issued or otherwise ratified by the District prohibiting students to wear "Let's Go Brandon" clothing. (Ex. 5, p. 70; Ex. 6, p. 37; Ex. 7, p. 55). In fact, based on the evidence contained in the record, only three students were ever asked to remove "Let's Go Brandon" clothing. All three incidents involved middle school students in the Spring of 2022 and these requests were all made by <u>one</u> building administrator –Buikema. (Ex. 3, p. 70; Ex. 3, 51-53, 57-58, 65; Ex. 5, p. 68).

## LEGAL STANDARD

Summary judgment should be granted if the pleadings and evidence "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## LAW AND ARGUMENT

**I.    PLAINTIFFS' LAWSUIT SHOULD BE DISMISSED FOR LACK OF JURISDICTION.**

Failure by a plaintiff to obtain court approval to proceed anonymously deprives the court of jurisdiction to hear the matter. *See Citizens for a Strong Ohio v. Marsh*, 123 Fed. Appx. 630, 636-37 (6th Cir., Jan. 3, 2005) ("[f]ailure to seek permission to proceed under a pseudonym is fatal to an anonymous plaintiff's case, because. . .the federal courts lack jurisdiction over the unnamed parties, as a case has not been commenced with respect to them")(citing *Nat'tl Commodity & Barter Ass'n, Nat'l Commodity Exch. v. Gibbs*, 886 F.2d 1240, 1245 (10th Cir. 1989)); *see also* Fed. R. Civ. P. R. 10(a)(stating that  "the complaint must name all the parties."). Here, Plaintiffs have not moved to proceed under pseudonyms. For this reason, this Court lacks jurisdiction over the unnamed parties warranting dismissal of this case.

**II.   BUIKEMA AND BRADFORD ARE ENTITLED TO QUALIFIED IMMUNITY.**

Should this Court find that it has jurisdiction to hear this case, the First Amendment claims against Buikema and Bradford should nevertheless be dismissed based on qualified immunity.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To determine whether a governmental official is entitled to qualified immunity a court should ask two questions. First, whether the government official's acts violated a constitutional right. *Aldini v. Johnson*, 609 F.3d 858, 863 (6th Cir. 2010). If no constitutional right would have been violated, then the governmental official is entitled to qualified immunity, and it is unnecessary for the court to conduct further inquiry into qualified immunity analysis. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see Neague v. Cynkar*, 258 F.3d 504, 508 (6th Cir. 2001). If a violation could be made out, the second question is whether the right at issue was "clearly established". *Aldini*, 609 F.3d at 863. A court may proceed with

6

considering either prong of the qualified immunity inquiry first, and either prong can serve as a basis for dismissal. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**A. Plaintiffs Cannot Establish a First Amendment Violation.**

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. CONST. amend. I. Freedom of speech is not unlimited. *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 356 (6th Cir. 2023). The Supreme Court held that speech, whether expressed orally, in writing, or symbolically by conduct, "is subject to reasonable time, place, or manner restrictions." *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984). "The schoolhouse is one such restriction." *Kutchinski*, 69 F.4th at 356. While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," their First Amendment rights are not coextensive with the rights of adults in other settings. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). Because of this, student's free speech rights apply "in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506.

The Supreme Court outlined four categories of student speech that schools may regulate:

> (1) indecent, offensively, lewd, [profane], vulgar speech uttered during a school assembly on school grounds; (2) speech during school or at school sponsored events that schools "reasonably regard as promoting illegal drug use; (3) "speech in school-sponsored expressive activities" if the schools' "actions are reasonably related to legitimate pedagogical concerns"; and (4) on-campus and some off-campus speech that "materially disrupts classwork or involves substantial disorder or invasions of the rights of others".

*Kutchinski*, 69 F.4th at 356-57(citing *Fraser*, 478 U.S. at 683-85; *Morse v. Frederick*, 551 U.S. 393, 408 (2007); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); *Tinker*, 393 U.S. at 513; and *Mahonoy Area Sch. Dist. v. B.L. ex rel Levy*, 141 S. Ct. 2038, 2045 (2021)). Only the first category and fourth category are at issue in this case.

Student speech that fits under the fourth category of student speech—i.e. speech that expresses a political viewpoint—is governed by *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503 (1969). In that case, school officials suspended students for wearing black armbands in protest of the Vietnam War. The Supreme Court held that the suppression of the students' political expression could not be validated when the students' behavior did not contribute to a disturbance in the educational environment. *See Tinker*, 393 U.S. at 508. The Court ultimately concluded that when school officials attempt to restrict students from expressing particular political views, they must demonstrate that the prohibition on such speech was necessary to avoid a material or substantial disruption of the school environment. *Id*. at 511-14.

In contrast, student speech that fits under the first category—i.e. is incident, lewd, profane, vulgar, and objectively offensive—is governed by *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675 (1986). *Fraser* involved a student's speech during a high school assembly for student counsel where the student nominated his peer. *Fraser*, 478 U.S. at 677-78. The speech was as follows:

> I know a man who is firm—he's firm in his pants, he's firm in his shirt, his character is firm—but most . . . of all, his belief in you, the students of Bethel, is firm . . . Jeff Kuhlman [the candidate] is a man who takes his point and pounds it in. If necessary, he'll take an issue and nail it to the wall. He doesn't attack things in spurts, he drives hard, pushing and pushing until finally—he succeeds . . . . Jeff is a man who will go to the very end—even the climax, for each and everyone of you . . . . So vote for Jeff for A.S.B. vice-president—he'll never come between you and the best our high school can be.

*Fraser*, 478 U.S. at 687 (Brennan, J. concurring). Based on the student's use of "elaborate, graphic and explicit sexual metaphor[s]" throughout the speech, the school suspended Fraser and took him out of the running for graduation speaker. *Id*. at 678.

The Supreme Court acknowledged that while the student's speech contained sexual innuendos rather than express vulgarities and profanities, the speech was still considered lewd,

indecent, and plainly offensive given that the audience was high school children. *Id.* at 683-684.

The Court explained:

> The schools, as instruments of the state, may determine that the essential lessons of civil mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct such as that indulged in by this confused boy. The pervasive sexual innuendo in Fraser's speech was plainly offensive to both teachers and students—indeed to any mature person. By glorifying male sexuality, and in its verbal content, the speech was acutely insulting to teenage girl students. The speech could well be seriously damaging to its less mature audience, many of whom were only 14 years old and on the threshold of awareness of human sexuality. Some students were reported as bewildered by the speech and the reaction of mimicry it provoked.

*Id.* The Court ultimately held that the school district acted within its authority in disciplining Fraser for his offensively lewd, vulgar, and indecent speech. *Id.* at 685. The Court further clarified that its decision in *Fraser* was distinguishable from *Tinker* in a very important respect. While the speech in *Fraser* touched on a form of political speech, **the imposition of discipline was unrelated to any political viewpoint**. *Id.* Instead, the imposition of discipline was due to the speech's lewd, vulgar, profane, and offensive nature, which the Court concluded could be prohibited in school since such speech "would undermine the school's basic educational mission." *Id.* As the Court explained, "[a] high school assembly or classroom is no place for a sexually explicit monologue directed towards unsuspecting audience of teenage students. Accordingly, it was perfectly appropriate for the school to disassociate itself to make the point to pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education.'" *Id.* at 685-86.

The Supreme Court reaffirmed its holding in *Fraser* in two subsequent student speech cases. *See Hazelwood*, 484 U.S. at 271 n.4 (holding that the Court's decision in *Fraser* rested on the fact that the student was disciplined because the character of the speech at issue was vulgar, lewd, and plainly offensive rather than the fact that it disrupted the school environment.); *see*

9

*Morse*, 551 U.S. at 404-405. The Court summarized the holding in *Fraser* in the following manner in *Morse*:

> First, *Fraser*'s holding demonstrates that "the constitutional rights of students in public school is not automatically coextensive with the rights of adults in other settings." **Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected. In school, however, Fraser's First Amendment rights were circumscribed "in light of the special characteristics of the school environment."** Second, *Fraser* established that the mode of analysis set forth in *Tinker* is not absolute. Whatever approach *Fraser* employed, it certainly did not conduct the "substantial disruption" analysis prescribed by *Tinker*.

*Id.* at 404-405 (internal citations omitted)(emphasis added). In sum, according to *Fraser* student speech that is considered lewd, vulgar, profane, and plainly offensive for school age children can be categorically prohibited by public schools since it is inconsistent with the school's educational mission. Even if the lewd, vulgar, profane, and plainly offensive speech can be interpreted to comment on a political, social, or religious issue, then *Tinker* does not apply if the basis for the regulation is unrelated to any political, social, or religious viewpoint.

The case law analyzing the application of *Fraser* verses *Tinker* in the context of student dress is sparse in the Sixth Circuit. However, based on the relatively few cases that address this issue, the Sixth Circuit looks to the basis for the schools' regulation when determining whether *Fraser* or *Tinker* applies. If the school regulated the student dress because it was reasonably determined to be vulgar, lewd, profane, or offensive, and contrary to the school's educational mission, then *Fraser* applies. *See e.g., Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 470-71(6th Cir. 2000), cert. denied, 532 U.S. 920 (2001). In such a case, the school district has the authority to categorically prohibit the dress without offending the student's First Amendment rights. *Id.* In contrast, if regulation was intended to suppress a particular protected viewpoint, then *Tinker* applies, which only allows regulation when the school reasonably believes that the speech

10

will substantially and materially interfere with the school environment. *Id.* at 471; *see Castorina ex rel. Rewt. v. Madison County School Bd*. 246 F.3d 536, 542 (6th Cir. 2001); *see also Barr v. Lafon*, 538 F.3d 554, 577 n. 7 (6th Cir. 2008).

*Boroff*, a case from the Sixth Circuit, illustrates that "Let's Go Brandon" apparel could be prohibited at school based on its profane meaning under *Fraser*. In *Boroff*, a high school senior student filed a First Amendment lawsuit against his school district based on his desire to wear Marilyn Manson t-shirts to school. 220 F.3d at 466. On one occasion the student wore a Marilyn Manson t-shirt to school and was told by the high school principal that the shirt was offensive and violated the dress code. *Id.* at 467. The student was then asked to turn the shirt inside out or go home and change. *Id.* The student opted to leave school. *Id.* He then came back the next day and wore another Marilyn Manson t-shirt to school. *Id.* In response, the student was called to the office to have a meeting with the high school principal, the superintendent and his parent. *Id.* During the meeting, the student was informed that students were not permitted to wear Marilyn Manson t-shirts on school grounds. *Id.* The student then proceeded to wear a Marilyn Manson t-shirt the next three school days. *Id.* Each day the student was informed that he would not be permitted to attend school if he was wearing the Marilyn Manson t-shirts. *Id.* The student then missed four days of school. On the fifth missed day, the student filed suit against the school. *Id.* The district court entered summary judgment in favor of the school and dismissed the case. *Id.* The student then appealed the case to the Sixth Circuit. *Id.*

On appeal, the student argued that the district court erred in finding that *Fraser* applied claiming that it was unreasonable for the administrators to find the t-shirts offensive, and because of this, *Tinker* should have applied. The Sixth Circuit disagreed. First, the Sixth Circuit indicated that the suppression of vulgar or plainly offensive speech is governed by *Fraser* and not *Tinker*.

11

*Id.* at 469. Second, the Sixth Circuit found that the school submitted evidence that established a reasonable basis for viewing the Marilyn Manson t-shirts as offensive, vulgar, and contrary to the educational mission of the school. *Id.* at 469, 471. The high school principal testified that some of the lyrics and views associated with Marilyn Manson were offensive, including lines such as "you can kill yourself now because you're dead in my mind," and "Let's just kill everyone and let your god sort them out/Fuck it/Everybody's someone else's nigger/I know you are so am I/ I wasn't born with enough middle fingers." *Id.* at 470. The high school principal testified that these types of lyrics were "contrary to the school educational mission and goal of establishing 'a common core of values that include . . . human dignity and worth . . . self respect, and responsibility' and also the goal of instilling 'into the students, an understanding and appreciation of the ideals of democracy and help to be diligent and competent in the performance of their obligations as citizens.'" *Id.* The school provided additional testimony from school officials that echoed that of the high school principal explaining that the t-shirts were against the educational mission. *Id.*

The Sixth Circuit also found it important that there was no evidence that the Marilyn Manson t-shirts were prohibited because of a particular viewpoint, even though one of the shirts contained an image of a three headed Jesus that an administrator viewed as "offensive because 'it mocked a major religious figure'". *Id.* at 470. In responding to the dissent the Sixth Circuit explained:

> In our view, however, the evidence does not support an inference that the School intended to suppress the expression of Boroff's viewpoint, because of its religious implications. Rather, the record demonstrates that the school prohibited Boroff's Marilyn Manson T-shirts generally because this particular rock group promotes disruptive and demoralizing values which are inconsistent with and counterproductive to education. The dissenting judge agrees that "[i]f the only T-shirts at issue in this case were the ones that simply displayed illustrations of Marilyn Manson largely unadorned by text, the judgment of the district court might be sustainable." He reasons, however, that the one T-shirt featuring the distorted Jesus figure may have been prohibited because the School's disagreement with its

religious message. In our view, the School's treatment of the "three-headed Jesus"
T-shirt and the others is not distinguishable. **The record establishes that all of the
T-shirts were banned in the same manner for the same reasons—they were
determined to be vulgar, offensive and contrary to the educational mission of
the school.**

*Id.* at 471 (emphasis added). Based on the above, the fact that the religious viewpoint of the three-headed Jesus T-Shirt was not the main reason for the regulation, was determinative.

In sum, the Sixth Circuit found that the school acted within its authority under *Fraser* in prohibiting students from wearing Marilyn Manson t-shirts at school since the school administrators reasonably determined that the Marilyn Manson t-shirts were not school appropriate based on the vulgar and offensive message behind the well-known band. *Id.* at 470-71(citing *Fraser*, 478 U.S. at 683).

*Boroff* establishes that the Sixth Circuit has adopted a broad interpretation of *Fraser*, finding that *Fraser* provides school districts with wide latitude to categorically prohibit clothing that reasonably conveys a lewd, vulgar, profane, or offensive message that the school determines to be inappropriate and contrary to its educational mission.

Here, the regulation of "Let's Go Brandon" apparel fits squarely under *Fraser* and not *Tinker*. Looking to the basis of the regulation, X.A. and D.A. were asked to remove their "Let's Go Brandon" apparel because the phrase means "Fuck Joe Biden", which is profane. (Ex. 3, p. 51-53, 57-58, 65-66, 68; Ex. 4, p. 33-34). There is no evidence that Buikema or Bradford intended to regulate a particular political viewpoint. So, *Tinker* does not apply.

The fact that the phrase "Let's Go Brandon" does not contain express profanity is of no consequence. First, as the Supreme Court explained the speech must be analyzed in the school context and "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *See Morse*, 551 U.S. at 404-405. Because of this, the

sexual metaphors used in Fraser's speech may have constituted protected speech if delivered in a public forum outside the school context. However, in the school context, the school had the authority to prohibit such speech since the sexual metaphors were considered lewd, vulgar, and plainly offensive to teenage children. The "Let's Go Brandon" phrase is no different than the sexual metaphors used in Fraser's speech. While the phrase "Let's Go Brandon", does not contain any words that are expressly vulgar, lewd, profane, or offensive, when looking to the implied meaning of the phrase (**Fuck Joe Biden**), the implied meaning is profane. Implied profanity may be protected in public forums outside the school context. However, as in *Fraser*, the First Amendment does not prevent school officials from determining that clothing that conveys a well-known profane message is inappropriate for young children and that permitting such speech in public schools would undermine the educational mission. Second, as in *Boroff*, the evidence shows that Buikema and Bradford reasonably interpreted the phrase "Let's Go Brandon" as profane. Both D.A. and X.A. admitted that the phrase "Let's Go Brandon" means "Fuck Joe Biden", and they were aware of this profane meaning when they wore the sweatshirts to school. (Ex. 1, p. 10-11; Ex. 2, p. 8).

Also, just because the "Let's Go Brandon" phrase can interpreted to convey some sort of political message does not establish that Buikema or Bradford engaged in "viewpoint discrimination" by prohibiting the apparel similar to the armband prohibition in *Tinker*. As in *Boroff*, the evidence does not support an inference that either Buikema or Bradford intended to suppress D.A. or X.A.'s political viewpoints. Instead, the record shows that Buikema and Bradford's actions were based solely on their determination that the "Let's Go Brandon" apparel contained a profane message that was contrary to the school's educational mission. (Ex. 3, p. 51-53, 57-58, 65-66, 68; Ex. 4, p. 10-11, 26-27, 36-37). Thus, Buikema and Bradford acted entirely

within their authority in prohibiting X.A. and D.A.'s from wearing clothing to school that had a profane message under *Fraser*. Therefore, Plaintiffs cannot establish a First Amendment violation.

### B. Plaintiffs Cannot Establish that the Rights at Issue were Clearly Established.

Even if this Court finds that Buikema and Bradford violated D.A. and X.A.'s First Amendment rights, they would nevertheless be entitled to qualified immunity since Plaintiffs cannot meet their burden of establishing that the rights at issue were "clearly established" at the time of the challenged conduct. *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

The Supreme Court recently reminded lower courts that "clearly established law should not be defined at a 'high level of generality'—it 'must be particularized to the facts of the case.'" *White v. Pauly*, 580 U.S. 73, 79 (2017). This means that there must be existing precedent that places the contours of the right "beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015). It is insufficient that the principle is merely suggested by the existing precedent. Rather, that precedent "must be clear enough that **every** reasonable [school] official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590. Also, this inquiry must "be undertaken in the light of the specific context of the case, not as a broad general proposition." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001); *District of Columbia v. Wesby*, 583 U.S. 48, 138 S.Ct. 577, 590 (2018). S*ee Stevens-Rucker v. City of Columbus,* 739 F. App'x 834, 839 (6th Cir. 2018). "[T]his narrow definition of 'clearly established' functions to protect 'all but the plainly incompetent or those who knowingly violate the law.'" *Mitchell v. Schlabach*, 864 F.3d 416, 424 (6th Cir. 2017). It also serves to protect reasonable but mistaken decisions by school officials acting in good faith. *See Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

This means that Plaintiffs must point to precedent that existed in March of 2022 that would show that a reasonable school official confronted with the same situation as Buikema and Bradford would have known that requesting a middle school student to remove a sweatshirt that contained a phrase, with well-known profane meaning, would violate a student's First Amendment rights.

There are no cases in the Supreme Court or in the Sixth Circuit that analyze a student's First Amendment rights to wear clothing to school with a message with a well-known profane meaning. That being said, the most factually similar cases, *Fraser* and *Boroff*, suggest that that a reasonable school official in either Buikema and Bradford's position would believe that they had the authority to prohibit clothing with a profane message. In fact, the evidence contained in the record provides further support for this conclusion. Principal Joe Williams testified that he agreed with Buikema's determination that the "Let's Go Brandon" slogan was profane since it meant "Fuck Joe Biden" and agreed that it could be subject to regulation. (Ex. 5, p. 64-65). Thus, it cannot be said that the contours of the right at issue are "beyond debate". Therefore, Buikema and Bradford are entitled to qualified immunity.

## III.   PLAINTIFFS' *MONELL* CLAIMS AGAINST THE DISTRICT SHOULD BE DISMISSED.

To establish a Section 1983 claim against a school district, the plaintiff must establish that the school district itself is responsible for the constitutional deprivation under *Monell*. *See Monell v. Dept't of Soc. Servs.*, 436 U.S. 658, 694 (1978). The rational is, a school district is only responsible for its own legal acts and cannot be held vicariously liable under Section 1983 for the acts of its employees. *See D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014). Thus, in order to prove a *Monell* claim against a school district, the plaintiff must establish: (1) **a constitutional violation occurred**; and (2) **that the school district is responsible for the constitutional**

*violation*. *See Doe v. Caliborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996). In this case, Plaintiffs

cannot establish either element.

### A.    Plaintiffs' *Monell* Claims Fail Since They Did Not Establish a Constitutional Violation.

It is well established that "[i]f no constitutional violation by the individual defendants is

established, the municipal defendants cannot be held liable under § 1983. *Watkins v. City of Battle*

*Creek*, 273 F.3d 682, 697 (6th Cir. 2001); *see Kinkus v. Vill. Of Yorkville, Ohi*o, 289 F. App'x 86,

93 (6th Cir. 2008)(dismissing the *Monell* claim against the municipality because the conduct of

the individual defendants did not violate the First Amendment); *see Ashton v. Okemos Public*

*Schools*, __F.Supp.3d__, 2024 WL 503972, at *14 (W.D. Mich. Feb. 9, 2024). Here, because

Buikema and Bradford did not violate X.A. and D.A.'s First Amendment rights for the reasons

explained above, Plaintiffs' *Monell* claims against the District should be dismissed.

### B.    Plaintiffs' *Monell* Claims Fail Since They Cannot Prove that the District is Responsible for the Alleged Constitutional Violation.

As previously stated, not only must a plaintiff prove that he suffered a constitutional

violation in order to hold a school district liable, but he also must establish that the school district

is <u>responsible for the constitutional violation</u>. *See Doe v. Caliborne Cnty.*, 103 F.3d 495, 505-06

(6th Cir. 1996). With respect to this second element, a school district can only be liable if a

constitutional violation was ***caused*** by an official policy, custom, or practice. *Monell v. Dep't of*

*Soc. Serv. Of City of New York,* 436 U.S. 658, 690-91 (1978).

As to causation, the Sixth Circuit has explained that mere proof that a policy or a custom

was likely to cause a particular constitutional violation is not enough, instead, the plaintiff must at

least prove that there is an "'affirmative link' between policy or custom and violation." *Mann v.*

*Helmig*, 289 Fed. Appx. 845, 850 (6th Cir. 2008). Which means that the policy or custom must

17

have been the factual and proximate cause of the plaintiff's injury. *Crabbs v. Scott*, 800 Fed. Appx. 332, 338 (6th Cir. 2020). Thus, a failure to establish causation is fatal to a *Monell* claim. *See Crabbs*, 800 Fed. Appx. At 338-39. *Mann*, 289 Fed. Appx. at 850.

A plaintiff can establish the existence of an official policy, practice, or custom for purposes of establishing municipal liability in four ways: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the exitance of a custom of tolerance [of] or acquiescence [to] federal rights violations." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014)(citations omitted).

Here, even if this Court were to find that D.A. and X.A. suffered a First Amendment violation, Plaintiffs' *Monell* claim against the District would fail since Plaintiffs cannot establish that the District was **responsible** for the alleged violation under any of these four legal theories.

### 1. Plaintiffs Cannot Establish *Monell* Liability Based on the Existence of an Illegal Official Policy.

To establish municipal liability under an "official policy" theory, "a plaintiff must <u>identify the policy</u>, connect the policy to the [school district] itself, and show that the particular injury was incurred because of the execution of that policy." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 880 (6th Cir. 2020)(emphasis added).

Here, Defendants anticipate that Plaintiffs may claim that the dress code amounts to an illegal official policy. However, that argument will fail for two reasons. First, the dress code's express prohibition of clothing with a profane message is constitutional on its face under *Fraser*. *See Fraser,* 478 U.S. at 682. Because the part of the dress code that Buikema relied on when requesting X.A. and D.A. to remove the offending clothing is constitutional, it cannot be used to establish municipal liability against the District. *Wright*, 962 F.3d at 880.

18

Second, even if this Court were to find that Buikema and Bradford's conduct violated X.A. and D.A.'s First Amendment rights, this does not render the dress code's prohibition on clothing with profane messages illegal. The fact that the dress code's prohibition could be capable of misapplication does not change this result since Plaintiffs cannot prove that the dress code was calculated to discourage constitutionally protected speech. The Sixth Circuit has explained in the context of municipal codes, "[t]o devise a detailed code of . . . conduct incapable of misapplication would be utterly impossible, or so we should find it, but that does not mean that the Constitution bars codes of . . . conduct generally." *Brown v. Trenton*, 867 F.2d 318, 323-324 (6th Cir. 1989). Interpreting *Brown*, courts in the Sixth Circuit have found that when a First Amendment official policy claim is premised on a similar code of conduct, the plaintiff must show that the policy in question either was abused or was intentionally designed to discourage protected speech. *See Boulton v. Swanson*, __F. Supp.3d__, 2014 WL 4601958 (E.D. Mich. Sept. 15, 2014); *Cherry v. Pickell*, 188 Fed. App's 465, 471 (6th Cir. 2006)(holding that the plaintiff must show that the written code was calculated to discourage constitutionally protected speech). Otherwise, there is insufficient evidence to establish a causal connection between the official policy and the plaintiff's claimed injury.

This standard is seemingly higher in the student code of conduct context, since it it well established that student's First Amendment rights are not coextensive with the rights of adults in other settings, and that student free speech rights apply "in light of the special characteristics of the school environment". *Tinker*, 393 U.S. at 506; *see Fraser*, 478 U.S. at 686 (1986)(explaining that a school's disciplinary rules need not be as detailed as a criminal code that imposes criminal sanctions since a school may need to impose disciplinary action for a wide range of unanticipated conduct that disrupts the school environment)).

Here, there is no evidence that anyone abused the dress code or that it was intentionally destined to discourage protected speech. Absent such evidence, the dress code cannot be said to be the <u>driving force</u> behind Buikema and Bradford actions. This is true even if they misapplied the dress code in finding that the "Let's Go Brandon" apparel was profane.

### 2. Plaintiffs Cannot Establish *Monell* Liability Based on Buikema's Decision to Regulate "Let's Go Brandon" Apparel Since He is Not a Final Policymaker.

A municipal official's single unconstitutional action is sufficient to establish the existence of an unconstitutional policy or custom when the municipal official had final policymaking authority. *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). As the Supreme Court explained:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered . . . . Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.

*Id.* at 481-83 (emphasis added). As stated above, whether an official has such final policymaking authority is typically a question of state. *Id.* However, courts can also look to local law or to "custom or usage having the force of law." *Adkins v. Bd. Of Educ. Of Magoffin County, Ky.*, 982 F.2d 952, 957 (6th Cir. 1993); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

In contrast, the singular actions of one government official does not constitute a "policy" for purposes of municipal liability when it is an isolated incident that amounts to nothing more than the governmental official exercising his discretionary authority in making a discrete decision. *Pembaur*, 475 U.S. at 481-82. The Supreme Court has emphasized that "**[t]he fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on the exercise of that discretion**." *Id.* (emphasis

added). The Sixth Circuit has reiterated that an official's exercise of discretion *alone* to carry out job duties does not transform the official's decisions into policy, explaining that **"[d]iscretion to act is not to be confused with policymaking authority; no municipal liability results where an official merely has discretion to act because subjecting a municipality to liability in such a situation would be 'indistinguishable' from respondeat superior liability**". *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993)(emphasis added).

Even if the government official has some authority delegated from policymaking officials, the government official will not be a final policy maker **unless the official's decisions are final and unreviewable and not constrained by the official policies of superior officials**. *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005)(citations omitted); *see Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004)("mere authority to implement pre-existing rules is not the authority to set policy"). *Adkins* is instructive. *See Adkins*, 982 F.2d 952. In that case, the plaintiff argued that a superintendent's decision not to recommend a secretary for contract renewal because she would be working for her husband amounted to "policy" since the superintendent was a final policymaker. The Sixth Circuit disagreed, finding that the school district could not be held liable for the superintendent's actions. *Id.* at 959. The Sixth Circuit reasoned that under Kentucky state law, a school board makes all final decisions regarding personnel hiring and firing. *Id.* And while the superintendent is required to make recommendations to the board, the school board and not the superintendent had "final policymaking authority." *Id.*

Here, Plaintiffs do not allege that any individual with final decision-making authority ratified any of the alleged illegal actions. To the extent that Plaintiffs attempt to rely on Buikema as an official with final policymaking authority, such an argument would fail for the same reasons articulated in *Adkins*. Based on Michigan state law, assistant principals do not have final

policymaking authority which lies solely with the Board of Education. The Revised School Code empowers the Board of Education with the authority to establish all rules applicable to students. *See* MCL 380.11a; *see* MCL 380.381; *see* MCL 380.384.

There is no evidence contained in the record that would suggest that the Board delegated its final policymaking authority to assistant principals. In fact, the record suggests the opposite. Board policy 5511 addresses student dress. (Ex. 10). In that policy, the Board directs <u>the superintendent</u> to create an administrative guideline to carry out the policy. (Id). While administrative guideline 5511 states that "[e]ach principal, <u>in connection with building staff</u>, shall develop a dress code which complies with Board of Education Policy 5511", it does not contain an express delegation over the creation of the dress code to assistant principals (Ex. 11). **Also, the dress code is always submitted to the Board of Education for *final* approval.** (Ex. 7, p. 21-22; Ex. 3, p. 14-15; Ex. 6, p. 14-15). In other words, the custom of the District is to have the dress code reviewed and approved by the the Board, meaning that any recommendation by the building principals with regard to the dress code is constrained by the official policies of superior officials.

Also, while building administrators were tasked with enforcing the dress code, as explained above, discretion to act pursuant to a policy is not the same as policymaking authority. *See Binelli v. Charter Tp. Of Flint*, 488 F. App'x 95, 99 (6th Cir. 2012)(holding that there was no municipal liability when the official acted as a "final decision maker" when she terminated the plaintiff because most of the employment policies in the Township were set by the Board, meaning that the decision maker was "thoroughly constrained" by the Board's policies). Instead, Buikema's decisions regarding student dress were constrained by the dress code and other similar policies set by the Board of Education. Because of this, any action by Buikema in prohibiting "Let's Go Brandon" apparel at school amounted to nothing more than him exercising his discretionary

22

authority and which is insufficient to establish that he had policymaking authority. *See Pembaur*, 475 U.S. at 481-82.

> ### 3. Plaintiffs Cannot Establish *Monell* Liability Based on a Policy of Inadequate Training.

Municipal Liability under a failure to train theory will exist only if the plaintiff "can prove that the [governmental agencies] failure to train evidences deliberate indifference to the rights of its inhabitants such that the failure to train in effect constitutes a governmental custom or policy within the *Monell* framework." *City of Canton v. Harris*, 489 U.S. 378 (1989). First the "plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *St. John v. Hickey*, 411 F.3d 762, 776 (6th Cir. 2005). The plaintiff must then prove, based on the prior history of unconstitutional conduct, that the "need for more or different training is **so obvious**," that the alleged inadequate training is "**so likely** to result in the violation of constitutional rights." *Berry v. City of Detroit,* 25 F.3d 1342, 1346 (6th Cir. 1994) (citations omitted). If the plaintiff can establish both of the above, he must then prove that the alleged inadequacy **caused** the plaintiff's constitutional injury. *Hilliard v. Walker's Party Store, Inc*., 903 F.Supp. 1162, 1180 (E.D. Mich. 1995)(citing *Berry*, 25 F.3d at 1346).

"It is not enough to establish that a particular officer was inadequately trained, or that there was negligent administration of an otherwise adequate program, or that the conduct resulting in the injury could have been avoided by more or better training. The plaintiff must identify a specific deficiency which is the actual cause of the constitutional deprivation." *Hilliard*, 903 F.Supp. at 1180 (citing *City of Canton*, 489 U.S. at 390-91).

Here, there is no evidence contained in the record that would show that the District had a prior history of First Amendment violations where the need for more or different training is so

obvious. This alone is fatal to Plaintiffs ability to establish municipal liability based on a failure to train theory. *See e.g.*, *Curry ex. rel. Curry v. Sch. Dist. of City of Saginaw*, 452 F. Supp. 2d 723, 732 (E.D. Mich. 2006)("This Court cannot conclude in the absence of any prior incident of religious confrontation that a jury could find that the need to offer training in the area was 'plainly obvious to [district] policymakers,' or the failure to train could be ascribed to their deliberate indifference to that need.")(citations omitted).

Furthermore, the fact that the right at issue is not clearly established similarly ends the *Monell* inquiry premised on a failure to train theory. *See e.g.*, *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017)("The absence of a clearly established right spells the end of [the plaintiff's failure to train/supervise] *Monell* claim.").

### 4. Plaintiffs Cannot Establish *Monell* Liability Based on the Existence of an Illegal Practice or Custom.

A policy need not be written. The plaintiff can also establish municipal liability by showing that the government officials acted pursuant to some unofficial illegal policy or custom. *Broad of Cty. Commissioners of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997). To establish municipal liability under a "custom" theory, the plaintiff must show that an unconstitutional custom existed, that the custom was connected to the municipality, and that the custom caused the constitutional violation. *Napier v. Madison County, Kentucky*, 238 F.3d 739, 743 (6th Cir. 2001).

Random or occasional acts by a government official will not meet the high threshold to be an illegal custom. To be a "custom", the conduct must be "**so widespread** as to have the force of law." 520 U.S. at 404 (emphasis added); *Monell,* 436 U.S. at 691(holding that the regularity of the policy or custom, as adopted by its officials, must be "so permanent and well settled" as to have "the force of law. Stated differently, "[a] "custom" or "policy" must represent a regularly occurring event. *Gregory v. Shelby Cnty.*, 220 F.3d 433, 442 (6th Cir. 2000). However, the Sixth Circuit has

explained that mere deviations from policy "on more than one occasion" cannot establish the existence of a custom since it cannot "establish that the practice was so widespread as to have the force of law." *Gregory*, 220 F.3d at 442.

In order to connect the "custom" to the municipality, the plaintiff still must establish that "the proper policymaking officials . . . acknowledge and acquiesce in the custom." *Braswell v. Corr. Corp. of Am.*, 419 F. App'x 622, 629–30 (6th Cir. 2011)(citations omitted). Thus, the school board itself—as the sole school policymaker under Michigan law—must be on notice of deficiencies and omissions in their programming and allow it to continue. *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011).

An instructive case is *Gregory v. Shelby County*. *See Gregory*, 220 F.3d 433. In *Gregory*, the plaintiff alleged that prison guards failed to close cell doors regularly, contrary to a written prison policy. *Id.* at 442. The plaintiff asserted a *Monell* claim, arguing that the prison guards deviations from the written policy established a custom sufficient for municipal liability. The Sixth Circuit rejected this argument. Although the record indicated that the prison guards deviated from the written policy on occasion, the court held that this was insufficient to establish the existence of a custom. *Id.* at 442.  The Sixth Circuit reasoned, "[the plaintiff] has wholly failed to point to evidence in the record suggesting that this lapse of compliance with the written policy was so well settled as to constitute a custom thereby attaching [municipal] liability." *Id.*

Here, Plaintiffs cannot establish the existence of an illegal custom for the same reasons articulated in *Gregory*. Plaintiffs claim that Buikema and Bradford acted according to a custom of prohibiting political expression. However, there is no evidence to support that the District had a practice of prohibiting students from wearing clothing that expressed a political viewpoint that was so widespread as to have the force of law. The opposite is true. The evidence shows that the District

25

permits students to wear clothing that expresses a political viewpoint. As the District's representative wrote in the June 9, 2022, letter attached to the Complaint, "[t]he District does not prohibit students from the right to express their political views or from wearing clothing with political slogans". (ECF No. 1-5, PageID 68). This position was echoed by the Superintendent in his 30(b)(6) deposition. (See Ex. 7, p. 29). In fact, every witness that was deposed in this case, including Plaintiffs D.A. and X.A., testified that he or she has witnessed students wearing clothing to school that expressed a particular political viewpoint. (Ex. 1, p. 15; Ex. 2, p. 11; Ex. 3, p. 19; Ex. 4, p. 11; Ex. 5, p. 18; Ex. 6, p. 18; Ex. 7, p. 29).

Moreover, Plaintiffs cannot prove that there is a causal connection between Buikema and Bradford's actions and this alleged custom. Buikema and Bradford testified that their decision was based on the profane message of the "Let's Go Brandon" apparel and was unrelated to any political viewpoint.

To the extent Plaintiffs attempt to claim that the District had a custom of banning Let's Go Brandon apparel, this argument similarly fails. The evidence shows that there was never a District approved ban on "Let's Go Brandon" apparel. (Ex. 5, p. 70; Ex. 6, p. 37; Ex. 7, p. 55). Nor has there been a pattern of similar instances of prohibiting students from wearing "Let's Go Brandon" apparel. The record shows Buikema is the only administrator that has ever asked a student to remove "Let's Go Brandon" apparel. The record also shows that Buikema only prohibited the attire on three separate occasions involving three different students (two of which were X.A. and D.A). (Ex. 3, p. 70). These three instances are insufficient to establish a custom of banning "Let's Go Brandon" apparel. And even if there was a ban, it could not be used to establish the existence of an *illegal* custom since such a ban would be constitutional under *Fraser* for the reasons explained above.

IV.     **PLAINTIFFS' CLAIMS FOR INJUNCTIVE AND DECLARATORY RELIEF IN COUNTS III, IV, AND V SHOULD BE DISMISSED.**

When a plaintiff seeks injunctive and declaratory relief, there are jurisdictional limits that come into play. The Supreme Court has explained that there must exist "a live case or controversy *__at the time that a federal court decides the case__*." *Buke v. Barnes*, 479 U.S. 361, 363 (1987); *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). Also, "[w]hen seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review." *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997).

A.      **Plaintiffs Lack Standing to Bring a Claim for Injunctive and Declaratory Relief Based on the Existence of a Ban on "Let's Go Brandon" Apparel.**

"Standing is the 'threshold question in every federal case.'" *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001)(citations omitted). In order to meet the case or controversy requirement of Article III, a plaintiff must have standing, that is "a sufficiently concrete and redressable interest in the dispute." *Warshak v. U.S.*, 532 F.3d 521, 525 (2008). Plaintiffs bear the burden of establishing standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998). In order to meet the standing requirement, the plaintiff must establish that he (1)"suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical" (2) "the injury has to be fairly traceable to the challenged action of the defendant";  and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favored decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)(quotations and citations omitted).

When considering the issue of standing in the context of a declaratory judgment and injunctive relief action, "allegations of past injury alone are not sufficient." *Fieger v. Mich. Sup.*

27

*Ct.*, 553 F.3d 955, 62 (6th Cir. 2009). "The plaintiff must . . . demonstrate actual present harm or a significant possibility of future harm." *Id.*

Here, Plaintiffs seek a declaration that the District's alleged policy, practice, and custom of banning "Let's Go Brandon" apparel violated D.A. and X.A.'s First Amendment Rights and constituted unlawful viewpoint discrimination. (ECF No. 1, PageID 23). Plaintiffs also seek a permanent injunction "enjoining the School District from enforcing a categorical ban on 'Let's Go Brandon' apparel". (ECF No. 1, PageID23-24, 27). However, Plaintiffs lack standing to bring these claims since there has never been a District issued ban on "Let's Go Brandon" apparel. (Ex. 5, p. 70; Ex. 6, p. 37; Ex. 7, p. 55). This prevents Plaintiffs from being able to prove either actual present harm or a significant possibility of future harm resulting from this non-existent ban.

Moreover, to the extent that Plaintiffs contend that since one administrator told them to remove their "Let's Go Brandon" apparel in one particular instance, that a different administrator might subject them to the same treatment under the dress code is too speculative to warrant injunctive relief. *See O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)("past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects); *see City of Los Angeles, v. Lyons*, 461 U.S. 95 (1983)(declining enter a permanent injunction enjoining the use of chokeholds by law enforcement officers just because the plaintiff that was put in a chokehold by a law enforcement officer in a past since such a request was too speculative).

**B.      Plaintiffs' Lack Standing to Challenge a Portion of the Dress Code that Buikema Did Not Rely On.**

The Sixth Circuit has cautioned that "a plaintiff must establish that he had standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions." *Midwest Media Prop., L.L.C. v. Symmes Twp.*, 503 F.3d 456, 464 (6th Cir.

2007)(citations omitted). Here, Buikema testified that he relied on the portion of the dress code that prohibited profane messages when he asked X.A. and D.A. to remove their "Let's Go Brandon" apparel. (Ex. 3, p. 65). Buikema similarly testified that he did not rely on the portion of the dress code that Plaintiffs' claim is unconstitutional vague and overbroad. (Id. at 65-66). Thus, Plaintiffs' lack standing to challenge a portion of the dress code as overbroad and vague that has no causal connection to their claimed injury.

**C.    The Alleged Offending Language in the Dress Code Was Removed, Rendering Plaintiffs' Overbroad and Vague Claims Moot.**

In the absence of a "live case or controversy," the mootness doctrine is triggered, and the constitutional requirements for justiciability are not met. *Ky. Right to Life, Inc. v. Terry*, 108 F.3d 637, 644 (6th Cir. 1997)(citations omitted). The Sixth Circuit has explained that when a case is premised on alleged unconstitutional legislation, and the legislation at issue is repealed or materially modified during the course of litigation to eliminate the controversy, then the constitutional claim is moot. *Terry*, 108 F.3d at 644. This is because there will no longer be a live case or controversy since the court is required to analyze the legislation in its current form. *Id.*

*Bench Billboard Company v. City of Cincinnati*, 675 F.3d 974 (6th Cir. 2012) is illustrative as to how these principles apply in the First Amendment context. In *Bench Billboard Company*, the plaintiff brought suit challenging the city's ordinance that restricted and limited access to advertising space on bench billboards and granted unbridled discretion to city managers to grant waivers of the restrictions. *Id.* at 978. The district court denied the city's motion to dismiss, finding that the plaintiff sufficiently pled its claim that the ordinance was unconstitutional under the First Amendment. *Id.* After entry of the district court's order, the city then amended the ordinance several times, which included deleting the challenged language. *Id.* at 979. On appeal, the Sixth

Circuit held that the amendment that deleted the challenged language mooted the plaintiff's constitutional claims that sought declaratory and injunctive relief. *Id.* at 981.

Thus, *Bench Billboard Company,* establishes that when the case challenges a school's written policy as unconstitutional, and that policy is repealed or materially modified during the course of litigation, then the constitutional claim based on that challenged policy is moot. *See Id; see Brandywine Inc. v. City of Richmond*, 359 F.3d 830, 836 (6th Cir. 2004)(Courts "can neither declare unconstitutional nor enjoin the enforcement of a provision that is no longer in effect."); *see Tini Bikinis-Saginaw, LLC v. Saginaw Charter Tp.*, 836 F. Supp. 2d 504, 521-22 (E.D. Mich. 2011).

Here, Plaintiffs claim that the District's dress code is unconstitutionally vague and overbroad by way of prohibiting attire that "is disruptive to the teaching and/or learning environment by calling undue attention to oneself". On March 11, 2024, the Board approved a revised version of the dress code that removes this language. (Ex. 8; Ex. 9). Based on *Bench Billboard Company* cited above, this material modification to remove the allegedly offending language renders Plaintiffs' overbroad and vague facial challenge of the dress code, as well as their requests for declaratory and injunctive relief, moot.

## CONCLUSION

For all the reasons stated above, Defendants request that this Court dismiss this case in its entirety, with prejudice, pursuant to Federal Rule of Civil Procedure 56.

/s/ANNABEL F. SHEA
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants

DATED: March 22, 2024

## <u>CERTIFICATE OF ELECTRONIC SERVICE</u>

ANNABEL F. SHEA states that on March 22, 2024, she did serve a copy of **Defendants'
Motion for Summary Disposition** via the United States District Court electronic transmission.

/s/ANNABEL F. SHEA

GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7081
ashea@gmhlaw.com
P83750

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that this brief complies with the type-volume limitations of L.Civ. R. 7.2(b)(ii). The brief was prepared in Microsoft Word 2010, using a times new roman 12 pt. font. Microsoft Word 2010 has a function that calculates the number of words in a document. According to that function, there are 10,626 words in this brief.

/s/ANNABEL F. SHEA
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendants
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7081
ashea@gmhlaw.com
P83750

32