# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| D.A., a minor, by and through his mother B.A.; and X.A., a minor, by and through his mother B.A., | |
| *Plaintiffs,* | Case Number:  23-cv-423 |
| v. | Judge Paul L. Maloney |
| TRI COUNTY AREA SCHOOLS; ANDREW BUIKEMA, in his individual capacity; and WENDY BRADFORD, in her individual capacity, | Magistrate Judge Sally J. Berens |
| | **ORAL ARGUMENT REQUESTED** |
| *Defendants.* | ***Expedited Consideration Requested Under L.R. 7.1(e)*** |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CONOR T. FITZPATRICK
(Mich. P78981 / D.C. 90015616)
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

KELLEY BREGENZER
(NY. Bar No. 5987482)
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
kelley.bregenzer@thefire.org

*Counsel for Plaintiffs*

Plaintiffs D.A. and X.A., minors, by and through their mother, B.A., move under Federal Rule of Civil Procedure 56(a) for summary judgment. As set forth in the incorporated Brief, Defendants Andrew Buikema and Wendy Bradford violated Plaintiffs' First Amendment rights by preventing Plaintiffs from engaging in nondisruptive political expression at their public school (Claim I). Defendant Tri County Area Schools is liable for Buikema's and Bradford's constitutional violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (Claim II).

Tri County Area Schools is also violating the First Amendment by imposing an unconstitutional ban on apparel containing the "Let's Go Brandon" political slogan (Claim III) and enforcing a dress code provision prohibiting student attire which "calls undue attention to oneself," which is vague (Claim IV) and substantially overbroad (Claim V). Plaintiffs respectfully request the Court grant them summary judgment on Claims I and II as to liability, and on Claims III, IV, and V.

Plaintiffs request expedited consideration of this motion under Local Rule 7.1(e) in order to protect the right of public school students to engage in nondisruptive political speech about a presidential candidate during a presidential election year. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") And the "First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for a political office." *Mich. Chamber of Com. v. Land*, 725 F. Supp. 2d 665, 688 (W.D. Mich. 2010) (Maloney, J.) (quoting *Eu v. S. F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)).

Pursuant to Local Rule 7.1, Plaintiffs' counsel sought concurrence from Defendants' counsel for this motion on March 20, 2024. They did not concur.

Dated: March 22, 2024                    Respectfully submitted,

                                         /s/ Conor T. Fitzpatrick
                                         CONOR T. FITZPATRICK
                                         (Mich. P78981 / D.C. 90015616)
                                         FOUNDATION FOR INDIVIDUAL
                                             RIGHTS AND EXPRESSION
                                         700 Pennsylvania Ave. SE, Ste. 340
                                         Washington, D.C. 20003
                                         (215) 717-3473
                                         conor.fitzpatrick@thefire.org

                                         KELLEY BREGENZER
                                         (NY. Bar No. 5987482)
                                         FOUNDATION FOR INDIVIDUAL
                                             RIGHTS AND EXPRESSION
                                         510 Walnut St., Ste. 900
                                         Philadelphia, PA 19106
                                         (215) 717-3473
                                         kelley.bregenzer@thefire.org

                                         *Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

D.A., a minor, by and through his
mother B.A.; and X.A., a minor, by and
through his mother B.A.,

*Plaintiffs,*

v.

TRI COUNTY AREA SCHOOLS;
ANDREW BUIKEMA, in his individual
capacity; and WENDY BRADFORD, in
her individual capacity,

*Defendants.*

Case Number:  23-cv-423

Judge Paul L. Maloney
Magistrate Judge Sally J. Berens

**ORAL ARGUMENT REQUESTED**

**\*\*\*Expedited Consideration
Requested Under L.R. 7.1(e)\*\*\***

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CONOR T. FITZPATRICK
(Mich. P78981 / D.C. 90015616)
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

KELLEY BREGENZER
(NY. Bar No. 5987482)
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
kelley.bregenzer@thefire.org
*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page:

TABLE OF AUTHORITIES .......................................................................... iv

INTRODUCTION .......................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................... 3

  I.  D.A. and X.A. Attend Tri County Area Schools in Good
      Standing. ...................................................................................... 3

  II.  The School District's Dress Code Prohibits "Obscene" and
       "Profane" Attire. ......................................................................... 4

  III.  "Let's Go Brandon" Is a Popular, Non-Profane Anti-Biden
        Political Slogan. ......................................................................... 6

  IV.  D.A. and X.A. Wear "Let's Go Brandon" Apparel to School
       to Express Their Political Views. ............................................... 9

  V.  The School District Never Experienced Disruption Due to
      "Let's Go Brandon" or Other Political Apparel. ...................... 12

  VI.  D.A. and X.A. Sent a Cease and Desist Letter, but the
       School District Confirmed Its "Let's Go Brandon" Ban
       Remains in Effect. ..................................................................... 12

LEGAL ARGUMENT ................................................................................ 14

  I.  D.A. and X.A. Engaged in Protected Nondisruptive
      Political Expression by Wearing "Let's Go Brandon"
      Sweatshirts to School. (Claims I and III). ............................... 14

      A.  The First Amendment protects wearing clothing
          with the political slogan "Let's Go Brandon" to
          school. ............................................................................... 15

      B.  The "Let's Go Brandon" political slogan is not
          sexually explicit, vulgar, or lewd under *Fraser*. ......... 19

      1.  *Fraser* is a limited exception for sexually explicit or
          profane speech. ............................................................... 19

      2.  Defendants' justification of "coded" profanity is
          unmoored from *Fraser* and common sense. ................. 21

C.      In the alternative, D.A.'s and X.A.'s "Let's Go
        Brandon" sweatshirts are protected "ambiguously
        lewd" political speech. .................................................. 26

D.      Because there is no genuine issue of material fact
        Defendants censored protected speech, D.A. and
        X.A. are entitled to summary judgment. ................................... 27

II.     Because *Tinker* Clearly Established Plaintiffs' Right to
        Wear Political Apparel to School, Buikema and Bradford
        Are Not Entitled to Qualified Immunity. (Claim I) ........................... 28

A.      Viewing the facts in the light most favorable to
        D.A. and X.A. demonstrates Buikema and Bradford
        violated their constitutional rights. ........................................... 28

B.      D.A.'s and X.A.'s First Amendment rights were
        clearly established at the time of Buikema's and
        Bradford's conduct. ....................................................... 29

III.    Under *Monell*, the School District Is Responsible for
        Buikema's and Bradford's Constitutional Violations.
        (Claim II). ............................................................... 31

IV.     The Dress Code Provision Barring Attire Which "Calls
        Undue Attention to Oneself" Is Void for Vagueness.
        (Claim IV). .............................................................. 34

V.      The Dress Code Provision Barring Attire Which "Calls
        Undue Attention to Oneself" Is Unconstitutionally
        Overbroad. (Claim V). ..................................................... 37

CONCLUSION ...................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**CASES**

*Am. Booksellers Ass'n, Inc. v. Hudnut,*
 771 F.2d 323 (7th Cir. 1985)......................................................................... 25

*Anderson v. Liberty Lobby Inc.,*
 477 U.S. 242 (1986) ....................................................................................... 14

*Ashcroft v. al-Kidd,*
 563 U.S. 731 (2011) ....................................................................................... 29

*B.H. ex rel. Hawk v. Easton Area Sch. Dist.,*
 725 F.3d 293 (3d Cir. 2013) .............................................................. passim

*Barber ex rel. Barber v. Dearborn Pub. Schs.,*
 286 F. Supp. 2d 847 (E.D. Mich. 2003) ..................................................... 18

*Bethel Sch. Dist. No. 403 v. Fraser,*
 478 U.S. 675 (1986) .............................................................................. passim

*Blick v. Ann Arbor Pub. Sch. Dist.,*
 No. 19-CV-12127, 2023 WL 3689407 (E.D. Mich. May 26, 2023)............................ 8

*Bible Believers v. Wayne Cnty.,*
 805 F.3d 228 (6th Cir. 2015)................................................................ 32, 39, 40

*Boddie v. Am. Broad. Cos., Inc.,*
 881 F.2d 267 (6th Cir. 1989)........................................................................ 35

*Boroff v. Van Wert City Bd. of Educ.,*
 220 F.3d 465 (6th Cir. 2000)........................................................................ 25

*Broussard ex rel. Lord v. Sch. Bd. of City of Norfolk,*
 801 F. Supp. 1526 (E.D. Va. 1992) .............................................................. 25

*City of St. Louis v. Praprotnik,*
 485 U.S. 112 (1988) ....................................................................................... 33

*Deja Vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson Cnty.,*
 274 F.3d 377 (6th Cir. 2001)........................................................................ 38

*Doninger ex rel. Doninger v. Neihoff*,
   527 F.3d 41 (2d Cir. 2008) ...................................................................... 25

*FCC v. Pacifica*,
   438 U.S. 726 (1978) ........................................................................... 20, 21

*Feliciano v. City of Cleveland*,
   988 F.2d 649 (6th Cir. 1993) .............................................................. 32, 33

*Flaherty v. Keystone Oaks Sch. Dist.*,
   247 F. Supp. 2d 698 (W.D. Pa. 2003) ........................................... 35, 38, 39

*Ginsberg v. New York*,
   390 U.S. 629 (1968) ................................................................................. 20

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ................................................................................. 35

*Guiles ex rel. Guiles v. Marineau*,
   461 F.3d 320 (2d Cir. 2006) ............................................................. passim

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ........................................................................... 18, 19

*Hill v. Colorado*,
   530 U.S. 703 (2000) ................................................................................. 34

*Holloman ex rel. Holloman v. Harland*,
   370 F.3d 1261 (11th Cir. 2004) ............................................................... 30

*Holzemer v. City of Memphis*,
   621 F.3d 512 (6th Cir. 2010) ................................................................... 29

*Hope v. Pelzer*,
   536 U.S. 730 (2002) ................................................................................. 29

*Hustler Mag., Inc. v. Falwell*,
   485 U.S. 46 (1988) ................................................................................... 15

*Hynes v. Mayor & Council of Borough of Oradell*,
   425 U.S. 610 (1976) ................................................................................. 35

*In re Citadel Broad. Co.*,
   177 FCC Rcd. 483 (2002) ......................................................................... 22

*J.D.B. v. North Carolina*,
564 U.S. 261 (2011) ............................................................................ 27

*J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*,
650 F.3d 915 (3d Cir. 2011) ............................................................. 17

*Leonard v. Robinson*,
477 F.3d 347 (6th Cir. 2007) ............................................................ 14

*Libertarian Party of Ohio v. Husted*,
751 F.3d 403 (6th Cir. 2014) ............................................................ 34

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
141 S. Ct. 2038 (2021) .............................................................. passim

*Massachusetts v. Oakes*,
491 U.S. 576 (1989) ........................................................................... 38

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978) ............................................................... 31, 32, 33

*Morse v. Frederick*,
551 U.S. 393 (2007) .................................................................. passim

*New York v. Ferber*,
458 U.S. 747 (1982) ........................................................................... 38

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........................................................................... 15

*Nixon v. N. Loc. Sch. Dist. Bd. of Educ.*,
383 F. Supp. 2d 965 (S.D. Ohio 2005) ............................................ 23

*Nuxoll ex rel. Nuxoll. v. Indian Prairie Sch. Dist. No. #204*,
523 F.3d 668 (7th Cir. 2008) ....................................................... 19, 23

*Olmstead v. United States*,
277 U.S. 438 (1928) ............................................................................. 3

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986) ........................................................................... 33

*Pyle ex rel. Pyle v. S. Hadley Sch. Comm.*,
861 F. Supp. 157 (D. Mass. 1994) ................................................... 25

vi

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........................................................................ 39

*Rosenblatt v. Baer*,
383 U.S. 75 (1966) .......................................................................... 15

*Rudd v. City of Norton Shores*,
977 F.3d 503 (6th Cir. 2020) ........................................................... 15

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001) ..................................................... 19, 39

*Shelton v. Tucker*,
364 U.S. 479 (1960) ........................................................................ 16

*Smith ex rel. Smith v. Mount Pleasant Pub. Schs.*,
285 F. Supp. 2d 987 (E.D. Mich. 2003) .......................................... 35

*Soper v. Hoben*,
195 F.3d 845 (6th Cir. 1999) ........................................................... 31

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*,
28 F. 4th 529 (4th Cir. 2022) .......................................................... 33

*Terminiello v. City of Chicago*,
337 U.S. 1 (1949) ............................................................................ 37

*Texas v. Johnson*,
491 U.S. 397 (1989) ........................................................................ 22

*Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*,
607 F.2d 1043 (2d Cir. 1979) .......................................................... 21

*Tinker v. Des Moines Area Sch. Dist*,
393 U.S. 503 (1969) ................................................................. passim

*Tolan v. Cotton*,
572 U.S. 650 (2014) ........................................................................ 28

*West Virginia St. Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) .................................................................... 3, 25

## STATUTES

42 U.S.C. § 1983 .................................................................................... 31

## COURT RULES

Fed. R. Civ. P. 56 ................................................................................. 14

## OTHER AUTHORITIES

167 Cong. Rec. H5774-01, H5776 (2021) ................................................ 7, 24

167 Cong. Rec. H5880-01, H5880 (2021) ................................................ 7, 24

168 Cong. Rec. H5240-05, H5240 (2022) ................................................ 7, 24

Annie Linskey, *How 'Let's go Brandon' became an unofficial GOP slogan*,
    Wash. Post (Nov. 15, 2021) ............................................................. 6

Carrie A. Beyer, *Fighting for Control: Movie Studios and the Battle over Third-Party
    Revisions,*
    2004 U. Ill. L. Rev. 96 (2004) ......................................................... 22

Kaia Hubbard, *Biden leans into "Dark Brandon" meme after Chiefs' Super Bowl
    win,* CBS News (Feb. 12, 2024) ....................................................... 8

Maureen Breslin, *Trump campaign sells 'Let's Go Brandon' T-shirts*,
    The Hill (Oct. 28, 2021) .................................................................. 6

Paula Denton, *The Power of Our Words: Teacher Language that Helps Children
    Learn*
    14 (2d ed. 2015) ............................................................................ 27

Susan B. Kaiser, *The Social Psychology of Clothing and Personal Adornment*
    (1985) ......................................................................................... 35

## INTRODUCTION

Fifty-five years ago, the Supreme Court affirmed students have a First Amendment right to wear politically expressive apparel to public schools. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969). America's schools must be "nurseries of democracy," the Court has explained, preparing the next generation for the "hazardous freedom" of living in a country where their neighbors and leaders may not think, talk, or pray the same way they do. *Id.* at 508; *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021). So our Constitution zealously protects students' freedom of speech, as long as their expression does not substantially disrupt the school day.

But Defendant Tri County Area Schools (the "School District") and its employees are defying *Tinker* by censoring students like Plaintiffs D.A. and X.A. who try to wear clothing expressing opposition to President Joe Biden. "Let's Go Brandon" is a popular anti-Biden political slogan, a cleaned up cultural reference to a "fuck Joe Biden" chant at a NASCAR race. Multiple members of Congress have used the slogan in floor speeches, it is omnipresent on network television, and President Biden's reelection campaign has even repurposed the slogan for its own use. But Defendants ordered Plaintiffs and their classmates to remove "Let's Go Brandon" apparel, claiming the slogan is "pornographic." No, that is not what that word means.

Defendants concede Plaintiffs' and other students' "Let's Go Brandon" apparel did not disrupt school in any manner during (or after) the four months the students wore them. Under *Tinker*, we should be done. But Defendants say they can still ban the slogan because it is "code for using profanity against the President." So

1

Defendants claim that not only can they ban swearing, they can prohibit non-profane, nondisruptive political speech which might cause someone to *think* about a swear word. They cannot. It "is a bedrock principle," even in public schools, "that speech may not be suppressed simply because it expresses ideas that are offensive or disagreeable." *Mahanoy*, 141 S. Ct. at 2055 (Alito, J., concurring) (internal quotation omitted). Neither the "urgent wish to avoid . . . controversy" nor "undifferentiated fear or apprehension of disturbance" is enough "to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508, 510.

The Court should therefore reject Defendants' requests for qualified immunity. *Tinker*, *Mahanoy*, and other Supreme Court decisions from the last 50 years clearly establish public schools may not prohibit students from engaging in the "silent, passive" expression of wearing political apparel to school. *Tinker*, 393 U.S. at 508. True enough, schools may prohibit substantially disruptive behavior, swearing, and using sexually explicit speech. Those are narrow, carefully cabined exceptions to students' First Amendment rights. But schools may not censor political apparel simply because they dislike the thoughts and discussions it may provoke. The *Tinker* Court stressed political discussions and arguments are "not only an inevitable part of" school, they are "an important part" of an American education. *Id.* at 512.

The Court should also grant Plaintiffs summary judgment on their challenge to the School District's vague and overbroad dress code rule barring clothing which "calls undue attention to oneself." The School District admits it provides students and parents no guidance regarding what constitutes "undue attention," and no guardrails

to administrators and teachers to avoid arbitrary enforcement. It is a textbook example of a vague and overbroad regulation on speech.

Censoring nondisruptive political speech produces students unready for a life where every belief, no matter how sacred, will be fair game for disagreement and even ridicule (often with *real* swear words). And it teaches the next generation that the way to fight disagreeable speech is by silencing the speaker. "Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead v. United States*, 277 U.S. 438, 485 (1928). This is particularly true of our public educational institutions. "That [schools] are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). The Court should grant Plaintiffs' motion.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

## I.   D.A. and X.A. Attend Tri County Area Schools in Good Standing.

Plaintiffs D.A. and X.A. are students in Sand Lake, Michigan's Tri County Area School District (the "School District"). (Ex. 1, D.A. Dec. ¶ 3; Ex. 2, X.A. Dec. ¶ 3.) D.A. is an eighth-grade student at Tri County Middle School ("TCMS") and X.A. is a sophomore at Tri County High School ("TCHS"). (Ex. 1, D.A. Dec. ¶ 4; Ex. 2, X.A. Dec. ¶ 4.) They live with their mother B.A. in Newaygo County, Michigan. (Ex. 3, D.A. Dep. Tr. 8:10–13; Ex. 4, X.A. Dep. Tr. 7:15–18.)

During the 2021–2022 school year, D.A. (then in sixth grade) and X.A. (then in eighth grade) attended TCMS. (Ex. 3, D.A. Dep. Tr. 9:4–18; Ex. 4, X.A. Dep. Tr. 7:21–24.) D.A. and X.A. perform well in school and compete on their school's wrestling and track teams. (Ex. 3, D.A. Dep. Tr. 7:6–11, 17:1–9; Ex. 4, X.A. Dep. 7:1–8; Ex. 5, B.A. Dep. Tr. 15:8–17.) Tri County teachers and administrators describe D.A. and X.A. as "polite," "kind," and "a joy to have in class." (Ex. 6, ParentVUE email to B.A.; Ex. 7, Buikema Dep. Tr. 66:14–19, 67:3–15)

## II.    The School District's Dress Code Prohibits "Obscene" and "Profane" Attire.

Each school year, TCMS and TCHS provide teachers, students, and parents a "Student Handbook," detailing the School District's policies and goals. (Ex. 8, 2022–2023 TCHS Handbook; Ex. 9, 2022–2023 TCMS Handbook.) The Student Handbooks include a dress code. (Ex. 10, School District 30(b)(6) Dep. Tr. 26:6–12.) The dress code provides, "students and parents have the right to determine a student's dress" unless the school decides "a student's dress is in conflict with state policy, is a danger to the students' health and safety, [or] is obscene[.]" (Ex. 8, TCHS Handbook at 29; Ex. 9, TCMS Handbook at 24.)[1] The dress code also prohibits clothing "with messages or illustrations that are lewd, indecent, vulgar, or profane, or that advertise any product or service not permitted by law to minors." (Ex. 9, TCMS Handbook at 24.) Dress code

---

[1] The TCMS and TCHS handbooks for the 2022–2023 and 2023–2024 school years contain the same dress code provisions. *Tri County High School Handbook 2023-2024* at 29–30, https://www.tricountyschools.com/downloads/handbooks/2023-24_high_school_hanbook_final_approved_1.pdf [https://perma.cc/8NGG-NVMN]; *Tri County Middle School Handbook 2023-2024* at 23–24, https://www.tricountyschools.com/downloads/ms_counseling/2023-2024_ms_handbook_final_approved.pdf [https://perma.cc/H2S7-FDQP].

violations can result in parental notification, required clothing change, and, after multiple infractions, suspension. (Ex. 9, TCMS Handbook at 18.) The dress code does not prohibit political apparel. (*Id.* at 24.)

The School District tasks administrators and teachers with enforcing the dress code. (*Id.*; Ex. 10, 30(b)(6) Dep. Tr. 59:19–60:4, 70:4–9.) It affords them broad enforcement discretion: "Any questionable clothing is under the discretion of a teacher and/or administrator." (Ex. 9, TCMS Handbook at 24; *see also* Ex. 10, 30(b)(6) Dep. Tr. 32:15–33:19; 45:19–46:9.) The School District does not second-guess administrators' dress code determinations, and administrators do not need the School District's approval to discipline students for violations. (Ex. 10, 30(b)(6) Dep. Tr. 59:10–16, 70:4–71:5.)

The Student Handbook also prohibits apparel "disruptive to the teaching and/or learning environment by calling undue attention to oneself." (Ex. 9, TCMS Handbook at 24.) But the Handbook does not explain what constitutes "undue attention." (*Id.*) And the School District does not provide administrators, students, or parents with guidance on how to interpret the language. (Ex. 10, 30(b)(6) Dep. Tr. 67:3–23; Ex. 12, Williams Dep. Tr. 63:9–21; Ex. 13, Goheen Dep. Tr. 33:20–34:17.) TCHS Principal Tim Goheen, asked to explain the difference between clothing that "calls attention to oneself" versus "*undue* attention," testified, "[y]ou'd have to ask the student that question. They'd probably all have a different opinion on what that would mean." (Ex. 13, Goheen Dep. Tr. 33:15–19.)

### III.   **"Let's Go Brandon" Is a Popular, Non-profane Anti-Biden Political Slogan.**

The political slogan "Let's Go Brandon" originated at an October 2021 NASCAR race in Talladega, Alabama. After the race, won by Brandon Brown, members of the crowd chanted "Fuck Joe Biden" during Brown's post-race interview. A commentator remarked that the fans were shouting "Let's Go Brandon!"[2]

The phrase "Let's Go Brandon" quickly became part of the American cultural and political lexicon as a cleaned up slogan to express displeasure with President Biden and his administration.[3] Shortly after the race, the official Trump campaign began selling "Let's Go Brandon" shirts,[4] and the National Republican Congressional Committee sold "Let's Go Brandon" wrapping paper.[5] Sean Spicer, President Trump's former press secretary, called it "an amalgamation of everything that's going on. . . . It's about how the media has been complicit in supporting this administration. It's about Biden himself. It's about the left being triggered by everything that's going on. It's about cancel culture. It's about everything rolled into one."[6]

At the United States Capitol, elected officials embraced "Let's Go Brandon" as a way to convey strong disapproval of President Biden's administration and

---

[2] *See* sunnymoza, Original | UNEDITED – Let's Go Brandon |#Let'sGoBrandon, YouTube (Oct. 18, 2021), https://youtu.be/_zUlhpaZkJw (reposting live television footage).

[3] *See, e.g.*, Annie Linskey, *How 'Let's go Brandon' became an unofficial GOP slogan*, Wash. Post (Nov. 15, 2021, 6:00 AM), https://www.washingtonpost.com/politics/lets-go-brandon-republicans/2021/11/14/52131dda-4312-11ec-9ea7-3eb2406a2e24_story.html [https://perma.cc/2HDP-MRAA].

[4] *See, e.g.*, Maureen Breslin, *Trump campaign sells 'Let's Go Brandon' T-shirts*, The Hill (Oct. 28, 2021, 7:32 PM), https://thehill.com/media/579039-trump-campaign-sells-lets-go-brandon-t-shirts [https://perma.cc/T375-UWYP]

[5] Linskey, *supra* note 3.

[6] *Id.*

legislative initiatives. On October 21, 2021, Representative William J. Posey, who represents Florida's Eighth Congressional District, used the "Let's Go Brandon" slogan to punctuate a floor speech opposing President Biden's "Build Back Better Plan." 167 Cong. Rec. H5774-01, H5776 (2021). Roughly a week later, Representative Mary E. Miller, representing Illinois' Fifteenth Congressional District, similarly ended a speech in the House of Representatives with, "Our response to a weaponized Federal Government is loud and clear. In the spirit of freedom, we say: Let's go, Brandon." 167 Cong. Rec. H5880-01, H5880 (2021). And on June 7, 2022, Representative Douglas L. LaMalfa of California's First District finished his remarks on food security with, "I guess that is why everybody is leading the charge these days in cheering for: Let's go, Brandon." 168 Cong. Rec. H5240-05, H5240 (2022). Representatives Posey, Miller, and LaMalfa were not censured, ruled out of order, or disciplined for using the slogan on the House floor, nor did any member request a sanction from the presiding officer.

"Let's Go Brandon" airs uncensored on broadcast television. (*See, e.g.*, Ex. 14, CBS News Sacramento at 0:06, 1:06; Ex. 15, Noticias Telemundo at 0:01, 0:13, 0:23, 0:45, 2:37.) Networks say the slogan to explain its appearance on everything from road signs (Ex. 16, FOX 5 D.C., at 0:19, 0:36, 0:47, 1:36, 1:52) to fast food cups (Ex. 17, ABC 10 News at 0:12, 0:15.) AM/FM radio has no issues broadcasting the slogan, either. (Ex. 18, Mark Blazor Show, at 0:06, Ex. 19, WABC Brian Kilmeade, at 0:05, 0:23.) Cable networks CNN and Fox News aired panel discussions about this lawsuit with no compunction about uttering "Let's Go Brandon" on air. (Ex. 20, CNN Tonight

at 0:19; Ex. 21, FOX News at 0:07, 1:53.) Even President Biden used "Let's Go Brandon" on the air. (Ex. 22, NBC News at 0:10, 0:12.)[7]

President Biden's supporters repurposed "Let's Go Brandon" in mid-2022 as "Dark Brandon"—a pro-Biden internet meme stylizing the President's likeness to portray him as a superhero protagonist.[8] In February 2024, President Biden shared the "Dark Brandon" meme on his X (formerly Twitter) account to poke fun at conspiracy theories he fixed the outcome of the Super Bowl.[9] Now, the Biden-Harris reelection campaign sells a series of "Dark Brandon" merchandise on its website:[10]

  

---

[7] This Court can take judicial notice of these video and audio clips because their existence, not the truth of their content, is relevant. *See, e.g., Blick v. Ann Arbor Pub. Sch. Dist.*, No. 19-CV-12127, 2023 WL 3689407, at *16 (E.D. Mich. May 26, 2023) (taking judicial notice of various news article links, including news story videos, of students protesting school employment decisions).

[8] Alex Thompson & Allie Bice, *Dark Brandon Begins: How WH aides appropriated the meme of their boss as an underworld kin*, POLITICO (Aug. 8, 2022, 6:08 PM, https://www.politico.com/newsletters/west-wing-playbook/2022/08/08/how-a-meme-of-biden-as-an-underworld-king-became-appropriated-by-his-aides-00050405.

[9] Joe Biden (@JoeBiden), X (Feb. 11, 2024, 10:50 PM), https://twitter.com/JoeBiden/status/1756888470599967000; Kaia Hubbard, *Biden leans into "Dark Brandon" meme after Chiefs' Super Bowl win*, CBS News (Feb. 12, 2024, 11:31 AM), https://www.cbsnews.com/news/biden-dark-brandon-meme-chiefs-super-bowl-taylor-swift/ [https://perma.cc/Y5PN-TFPS].

[10] *See Dark Collection*, Biden-Harris Official Store, https://shop.joebiden.com/dark/ [https://perma.cc/8JN4-R433] (last visited Mar. 13, 2023).

IV. **D.A. and X.A. Wear "Let's Go Brandon" Apparel to School to Express Their Political Views.**

In December 2021, D.A. and X.A. received "Let's Go Brandon" sweatshirts as a Christmas present from their mother. (Ex. 5, B.A. Dep. Tr. 7:13–16.) The plain blue sweatshirt contains the political slogan without additional imagery or commentary:



(Ex. 23, Buikema Resp. to Pls.' RFAs No. 8; Ex. 24, Bradford Resp. to Pls.' RFAs. No. 6) (admitting this sweatshirt is what they observed D.A. and X.A. wearing).

In February 2022, D.A. wore his "Let's Go Brandon" sweatshirt to TCMS to express his dissatisfaction with President Biden. D.A. testified he sees the "Let's Go Brandon" political slogan as a "respectful" way to convey his views about President Biden without using swear words. (Ex. 3, D.A. Dep. Tr. 11:19–24.) Defendant Andrew Buikema, then assistant principal at TCMS, confronted D.A. in the hallway and instructed D.A. to remove the sweatshirt. (Ex. 3, D.A. Dep. Tr. 12:10–17; Ex. 7, Buikema Dep. Tr. 67:3–9.) Buikema told D.A. "Let's Go Brandon" "means the F-

word." (Ex. 7, Buikema Dep. Tr. 67:5–8.) Because D.A. was also wearing a "Let's Go Brandon" t-shirt underneath, Buikema directed D.A. to remove both and change into school-provided clothing. (Ex. 3, D.A. Dep. Tr. 12:14–21; Ex. 7, Buikema Dep. Tr. 67:5–13.) D.A. complied. (Ex. 3, D.A. Dep. Tr. 12:15–23; Ex. 7, Buikema Dep. Tr. 51:11–18.)

Buikema testified that throughout the interaction, D.A. remained "polite" and "kind." (Ex. 7, Buikema Dep. Tr. 67:14–15.) Buikema agreed D.A. was not breaking any other school rules. (Ex. 23, Buikema Resp. to Pls.' RFAs. No. 4.) But Buikema says he ordered D.A. to remove his "Let's Go Brandon" apparel because he considers the slogan "vulgar, profane, and pornographic," in violation of the dress code. (Ex. 25, Buikema Resp. to Pls.' Interrog. No. 1; Ex. 7, Buikema Dep. Tr. 51:11–52:2.)

A few weeks later, D.A. again wore his "Let's Go Brandon" sweatshirt to school to respectfully express his opposition to President Biden. (Ex. 1, D.A. Dec. ¶ 9.) Defendant Wendy Bradford, a TCMS teacher, stopped D.A. in the hallway and told him "take that off," "otherwise Mr. Buikema is right down the hallway, you can talk to him." (Ex. 26, Bradford Dep. Tr. 34:1–7.) D.A., fearing punishment, removed his sweatshirt. (Ex. 3, D.A. Dep. Tr. 14:25–15:1; Ex. 1, D.A. Dec. ¶ 11.)

Like Buikema, Bradford testified D.A. remained "polite" throughout the interaction. (Ex. 26, Bradford Dep. Tr. 34:13–16.) She acknowledged D.A. was not breaking any other school rules. (Ex. 24, Bradford Resp. to Pls.' RFAs No. 4.) But Bradford testified she believed D.A.'s plain "Let's Go Brandon" sweatshirt was "lewd, indecent, vulgar, and profane." (Ex. 26, Bradford Dep. Tr. 36:15–23.)

On May 26, 2022, X.A. wore his "Let's Go Brandon" sweatshirt to TCMS to respectfully express his opposition to President Biden. (Ex. 2, X.A. Dec. ¶ 7.) Buikema called X.A. out of class and summoned him to the TCMS front office. (Ex. 4, X.A. Dep. Tr. 10:3–6; Ex. 7, Buikema Dep. Tr. 66:11–16.) There, Buikema told X.A. he could not wear "Let's Go Brandon" apparel and told X.A. to remove the sweatshirt. (Ex. 4, X.A. Dep. Tr. 10:8–10; Ex. 7, Buikema Dep. Tr. 51:11–15, 66:16–18.)

Buikema testified X.A. "was super polite, kind, complied, and took [the] sweatshirt off." (Ex. 7, Buikema Dep. Tr. 66:18–19.) Like with D.A., Buikema acknowledged X.A. was not breaking any other school rules. (Ex. 23, Buikema Resp. to Pls.' RFAs No. 5.) But Buikema said he instructed X.A. to remove the sweatshirt because he found the slogan "vulgar, profane, and pornographic." (Ex. 25, Buikema Resp. to Pls.' Interrog. No. 3.)

Buikema also testified he asked a third student to remove his "Let's Go Brandon" sweatshirt in 2022. Like D.A. and X.A., the third student complied with Buikema's request and remained "polite." (Ex. 7, Buikema Dep. Tr. 70:10–21.)

Before Buikema and Bradford ordered D.A. and X.A. to remove their sweatshirts, the boys had never been asked to remove apparel due to the dress code. (Ex. 3, D.A. Dep. Tr. 16:17–22; Ex. 2, X.A. Dec. ¶ 11.) Although D.A. and X.A. wish to continue expressing their opposition to President Biden by wearing their "Let's Go Brandon" apparel to school, neither has, fearing future discipline. (Ex. 1, D.A. Dec. ¶ 12–13; Ex. 2, X.A. Dec. ¶ 12–13; Ex. 9, TCMS Handbook at 18.)

## V.  The School District Never Experienced Disruption Due to "Let's Go Brandon" or Other Political Apparel.

Before D.A., X.A., and other students began wearing "Let's Go Brandon" apparel, the School District had not experienced disruption due to students wearing political apparel to school or engaging in political discussions. (Ex. 12, Williams Dep. Tr. 34:23–35:1, 37:8–11; Ex. 26, Bradford Dep. Tr. 27:14–17; Ex. 13, Goheen Dep. Tr. 20:25–21:7, 22:18–21; Ex. 7, Buikema Dep. Tr. 41:5–15.) Similarly, it had not experienced disruption due to students using the "Let's Go Brandon" slogan or wearing apparel with the slogan. (Ex. 12, Williams Dep. Tr. 34:23–35:2–5; Ex. 7, Buikema Dep. Tr. 39:3–6; Ex. 13, Goheen Dep. Tr. 21:9–13.)

During discovery, TCMS' and TCHS' principals confirmed the schools did not experience disruption due to students wearing "Let's Go Brandon" or other political apparel. (Ex. 7, Buikema Dep. Tr. 39:14–41:4; Ex. 12, Williams Dep. Tr. 35:6–37:7; Ex. 13, Goheen Dep. Tr. 21:15–21.) Neither the School District nor its administrators received complaints about D.A. and X.A. wearing "Let's Go Brandon" apparel. (Ex. 11, Sch. Dist. Resp. to Pls.' RFAs. Nos. 1, 2; Ex. 24, Bradford Resp. to Pls.' RFAs. Nos. 1, 2; Ex. 23, Buikema Resp. to Pls.' RFAs. Nos. 1, 2.) Teachers did not halt or alter lessons due to the slogan, and the slogan did not cause altercations. (Ex. 12, Williams Dep. Tr. 44:18–46:6; Ex. 11, Sch. Dist. Resp. to Pls.' RFAs Nos. 3–4.)

## VI.  D.A. and X.A. Sent a Cease and Desist Letter, but the School District Confirmed Its "Let's Go Brandon" Ban Remains in Effect.

On May 27, 2022, D.A. and X.A., through counsel, sent the School District a letter, citing *Tinker,* demanding it lift the prohibition on "Let's Go Brandon" apparel. (Ex. 27, C&D Ltr.) The School District responded, through counsel: "The District

12

prohibits clothing or styles of expression that are vulgar or profane. The commonly known meaning of the slogan 'Let's Go Brandon' is intended to ridicule the President with profanity . . . 'Let's Go Brandon' is a transparent code for using profanity against the President." (Ex. 28, Sch Dist. Resp. Ltr. at 1.).

Given the School District's refusal to lift the ban, D.A. and X.A. filed this lawsuit against the School District, Buikema, and Bradford on April 25, 2023, seeking, among other things, an injunction and declaratory relief against the "Let's Go Brandon" prohibition as well as damages. (*See* Compl., PageID.1–71.)

Immediately after D.A. and X.A. filed their lawsuit, the School District's then-superintendent Al Cumings instructed TCMS Principal Joe Williams to document every instance of a student wearing "Let's Go Brandon Apparel," and to interrogate each student about why they were wearing it. (Ex. 12, Williams Dep. Tr. 46:18–47:20, Ex. 29, Williams' Notes; Ex. 7, Buikema Dep. Tr. 47:14–48:13.) Principal Williams then instructed all TCMS staff to alert his office if they saw a student wearing "Let's Go Brandon" apparel. (Ex. 30, All Staff Email.)

They did. Over the next few weeks, several students chose to wear "Let's Go Brandon" shirts to school, while others wrote the slogan or the initials "LGB" on their arm or hand. (Ex. 29, Williams' Notes.) Williams testified none of these students caused disruption or violated any other school rules with their silent political expression. (Ex. 12, Williams Dep. Tr. 44:18–45:7, 52:2–6, 52:25–53:4, 53:17–19, 57:4–19, 60:12–16.) Yet Principal Williams still interrogated each student in his office, demanding to know if they knew what the phrase "meant" and why they chose

to display it. (*Id.* at 43:17–44:9, 46:16–60:16.) Principal Williams admitted he could not remember another time in his ten years as an administrator he had called a student to his office for a "profanity" violation. (*Id.* at 53:5–16, 10:17–11:7.)

During his deposition, Principal Williams testified he considers "Let's Go Brandon" and even the "LGB" abbreviation to be profanity prohibited by the dress code. (*Id.* at 54:7–20.) But he conceded if a student were to instead wear "LGB" intending to express "Let's Go Bears," the student would not be violating school rules. (*Id.* at 54:7–23.)

## LEGAL ARGUMENT

Plaintiffs are entitled to summary judgment on each claim because there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion;" there must be a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). The Court should grant Plaintiffs summary judgment because Defendants lack "evidence on which the jury could reasonably find" in their favor. *Leonard v. Robinson*, 477 F.3d 347, 354 (6th Cir. 2007) (internal quotation omitted).

## I.    D.A. and X.A. Engaged in Protected Nondisruptive Political Expression by Wearing "Let's Go Brandon" Sweatshirts to School. (Claims I and III).

Defendants violated the First Amendment by ordering D.A. and X.A. to remove their "Let's Go Brandon" sweatshirts (Claim I) and barring them from wearing the apparel going forward (Claim III). Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506.

During school, the government may only restrict expression which causes, or may be reasonably forecast to cause, substantial disruption, or which invades the rights of others. *Id.* at 513–14. Defendants concede the "Let's Go Brandon" sweatshirts did neither. The Court should therefore grant summary judgment to D.A. and X.A. on Claim I as to liability, and on Claim III for injunctive and declaratory relief.

### A.     The First Amendment protects wearing clothing with the political slogan "Let's Go Brandon" to school.

The First Amendment protects criticizing the President of the United States. "Criticism of government is at the very center of the constitutionally protected area of free discussion." *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). Indeed, "[t]he great public outcry against the Sedition Act of 1789, which allowed the government to punish 'malicious' writings designed to bring public officials into 'disrepute,' emphatically exemplifies" the First Amendment right to criticize public officials. *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020).

So through "the early cartoon portraying George Washington as an ass," jabs at "Lincoln's tall, gangling posture," and caricatures of "Teddy Roosevelt's glasses and teeth," the Constitution has kept watchful guard over government attempts to police what Americans have to say about their leaders. *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 54–55 (1988). That is because the First Amendment embodies America's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

The "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). As the Supreme Court explained, "America's public schools are the nurseries of democracy" and "[o]ur representative democracy only works if we protect the 'marketplace of ideas.'" *Mahanoy*, 141 S. Ct. at 2046. So students' "freedom of expression" is a "fundamental right[] which the State must respect." *Tinker*, 393 U.S. at 511. And part of that "fundamental right" is wearing political apparel to school. *Id.*

*Tinker* governs this case. *Tinker* involved a middle school and high school punishing students for wearing black armbands to school as a silent protest of the Vietnam War. 393 U.S. at 504. The schools pointed to their "fear of a disturbance" if students wore the armbands. *Id.* at 508. The Supreme Court rejected the school's rationale as antithetical to America's marketplace of ideas and the First Amendment. "Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance." *Id.* "But," the Court explained, "our Constitution says we must take this risk; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society." *Id.* at 508–09.

The Court held the school could not punish the students for a "silent, passive expression of opinion, unaccompanied by any disorder or disturbance." *Id.* at 508. The Court stressed the school officials lacked evidence the armbands caused a substantial disruption or that they had "reason to anticipate that the wearing of the armbands

would substantially interfere with the work of the school or impinge upon the rights of other students." *Id.* at 509.

After *Tinker*, schools bear the burden of demonstrating a student's expression "would *materially and substantially interfere* with the requirements of appropriate discipline in the operation of the school" before punishing or censoring speech. *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926 (3d Cir. 2011) (en banc) (quoting *Tinker*, 393 U.S. at 509). A school can also satisfy *Tinker* by pointing to evidence showing it "reasonably forecast" substantial disruption from the student's speech. *Id.* at 928. Defendants, by their own admission, have neither.

D.A. and X.A. wore "Let's Go Brandon" sweatshirts to school as a silent, passive way to express their disapproval of President Biden. Defendants testified the School District did not experience any disruption due to the sweatshirts during (or after) the four-month period D.A., X.A., and other students wore them. (Ex. 7, Buikema Dep. Tr. 40:12–22, 41:2–4; Ex. 26, Bradford Dep. Tr. 28:10–17, 29:12–19; Ex. 12, Williams Dep. Tr. 36:17–21; Ex. 13, Goheen Dep. Tr. 21:18–22:1.) And, prior to the boys wearing "Let's Go Brandon" sweatshirts, the School District had not experienced disruption due to political apparel, the "Let's Go Brandon" slogan, or even political arguments generally. (Ex. 7, Buikema Dep. Tr. 38:20–39:6, 41:5–15; Ex. 26, Bradford Dep. Tr. 27:18–21, 29:20–23; Ex. 12, Williams Dep. Tr. 35:2–5, 37:8–11; Ex. 13, Goheen Dep. Tr. 20:25–21:13, 22:18–21.)

That means D.A.'s and X.A.'s "Let's Go Brandon" sweatshirts, like Mary Beth Tinker's armband, remained safely within the First Amendment's protection. *See also*

17

*Guiles ex rel. Guiles v. Marineau*, 461 F.3d 320, 322, 330–31 (2d Cir. 2006) (holding, given the lack of substantial disruption, the First Amendment protected a student's right to wear a shirt calling President George W. Bush a "Crook," "Cocaine Addict," "AWOL, Draft Dodger," and "Lying Drunk Driver"); *Barber ex rel. Barber v. Dearborn Pub. Schs.*, 286 F. Supp. 2d 847, 849, 858 (E.D. Mich. 2003) (awarding preliminary injunction against school's ban on student's shirt calling President George W. Bush an "International Terrorist").

After *Tinker*, the Supreme Court carved out three narrow exceptions when public schools may curtail student expression even without substantial disruption. First, schools may regulate student speech "bear[ing] the imprimatur of the school," such as a school newspaper, so long as its "actions are reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271–73 (1988). Second, schools may curb speech "that can reasonably be regarded as encouraging illegal drug use." *Morse v. Frederick*, 551 U.S. 393, 397 (2007). And third, schools may prohibit vulgar, lewd, and indecent speech. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 683–85 (1986).

While *Fraser* suggested public schools could also prohibit "offensive" student speech, *Morse* retreated from that language in 2007. *Morse*, 551 U.S. at 409. "[M]uch political and religious speech might be perceived as offensive to some," so "[*Fraser*] should not be read to encompass any speech that could fit under some definition of 'offensive.'" *Id. See also Nuxoll ex rel. Nuxoll. v. Indian Prairie Sch. Dist. No. #204*,

523 F.3d 668, 676 (7th Cir. 2008) (reversing district court and awarding a preliminary injunction against a school district's ban on "Be Happy, Not Gay" shirts).

Here, Defendants never claimed D.A.'s and X.A.'s sweatshirts could somehow be confused for the school's own speech, as in *Hazelwood*. Nor have Defendants argued "Let's Go Brandon" is an encouragement to use illegal drugs, as in *Morse*. And as explained in Section I(B), the cleaned up, intentionally non-profane "Let's Go Brandon" political slogan comes nowhere close to triggering *Fraser*'s narrow exception for "sexually explicit, indecent, or lewd speech." That means *Tinker* governs, and Plaintiffs prevail.

### B. The "Let's Go Brandon" political slogan is not sexually explicit, vulgar, or lewd under *Fraser*.

#### 1. *Fraser* is a limited exception for sexually explicit or profane speech.

The intentionally non-profane "Let's Go Brandon" political slogan does not fall within *Fraser*'s narrow allowance for schools to regulate sexually explicit, vulgar, or profane speech. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214 (3d Cir. 2001) (Alito, J.) ("To summarize: Under *Fraser*, a school may categorically prohibit lewd, vulgar or profane language.") And "[l]ewdness, vulgarity, and indecency normally connote sexual innuendo or profanity." *Guiles*, 461 F.3d at 327. "Let's Go Brandon" is not sexual innuendo, nor does it contain profanity.

Start with *Fraser* itself. *Fraser* involved a high school punishing a student for delivering a sexual-innuendo laden speech at a school assembly. 478 U.S. at 677–78. The student used "an elaborate, graphic, and explicit sexual metaphor" to endorse a student council candidate (*id.* at 678), proclaiming him "a man who is firm—he's firm

19

in his pants," promising he would "take[] his point and pound[] it in,"  and "will go to the very end—even the climax, for each and every one of you." *Id.* at 687 (Brennan, J., concurring in the judgment). During the speech, "some students hooted and yelled," while others "by gestures graphically simulated the sexual activities pointedly alluded to in [the student's] speech." *Id.* at 678 (majority opinion).

The Supreme Court held the speech fell outside the First Amendment's protection, stressing the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of" the student's assembly speech. *Id.* at 680. The Court noted its "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children." *Id.* at 684.

The Court pointed to *Ginsberg v. New York*, 390 U.S. 629 (1968), which upheld a statute banning the sale of sexually oriented material to minors. *Fraser*, 478 U.S. at 684. The Court explained when school authorities act in parents' shoes during the school day, there is an "obvious concern . . . to protect children—especially in a captive audience—from exposure to sexually explicit, indecent, or lewd speech." *Id.*

The *Fraser* Court also relied on *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978), which upheld the FCC's power to regulate an "indecent but not obscene" uncensored radio broadcast of George Carlin's "seven dirty words" monologue. *See Fraser*, 478 U.S. at 684–85. The monologue used "words [which] depicted sexual and

excretory activities in a patently offensive manner . . . [and] were broadcast at a time when children were undoubtedly in the audience." *Id.* (cleaned up).

In sum, as the en banc Third Circuit explained, "*Fraser* did no more than extend these obscenity-to-minors cases to another place where minors are a captive audience—schools." *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 305 (3d Cir. 2013) (en banc). The Second Circuit noted "the cases cited by *Fraser* all concern vulgarity, obscenity, and profanity." *Guiles*, 461 F.3d at 328. The now-common political slogan "Let's Go Brandon," of course, has none of these.

The *Fraser* Court echoed the Second Circuit's formulation that "the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's ["Fuck the Draft"] jacket." 478 U.S. at 682–83 (quoting *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist*, 607 F.2d 1043, 1057 (2d Cir. 1979) (Newman, J. concurring) (citing *Cohen v. California*, 403 U.S. 15 (1971)).

This makes good sense. Kids can't say "fuck" at school. But Defendants are asking this Court to dramatically expand *Fraser*. Under Defendants' view, a school could prohibit a student from wearing an anti-draft jacket with the slogan "Cohen's Jacket," because it might cause others to *think* about the words on Cohen's jacket. Nothing in *Tinker*, *Fraser*, *Morse*, or *Mahanoy* gives school officials such broad censorial powers over nondisruptive political speech.

### 2. Defendants' justification of "coded" profanity is unmoored from *Fraser* and common sense.

Still, Defendants insist they possess authority to censor "Let's Go Brandon" as a "code[d]" reference to the "fuck Joe Biden" chant. (Ex. 28, Sch Dist. Resp. Ltr. at 1.)

But removing profanity from political and artistic expression to make it kid-friendly is a staple of modern communication. It's why radio edits of songs and Kidz Bop exist. And it's how PG-13 and R-rated movies air on television. *See generally* Carrie A. Beyer, Fighting for Control: Movie Studios and the Battle over Third-Party Revisions, 2004 U. Ill. L. Rev. 967, 985–86 (2004). *See also In re Citadel Broad. Co.*, 17 FCC Rcd. 483, 486 (2002) (explaining why the radio edits to Eminem's Grammy-winning song "The Real Slim Shady" meant the edited song "was not patently offensive, and thus not actionably indecent").

Defendants know "Let's Go Brandon" is not profane or sexually indecent. Principal Williams testified that had a student who wrote "LGB" on their arm told him they intended to express "Let's Go Bears" instead of "Let's Go Brandon," the student would not have violated the profanity rule. (Ex. 12, Williams Dep. Tr. 54:5–23.) He similarly testified that if a student wearing a plain "Let's Go Brandon" shirt were to insist they merely intended to express support for former Detroit Tigers third baseman Brandon Inge, that, too, could have removed the school's profanity concern depending on the "context." (*Id.*) Far beyond prohibiting the sexual innuendo in *Fraser* or the utterance of an actual profanity, Defendants believe they can mete out punishment based not on what students say, but on what students are *thinking* when they say it.

They cannot. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397,

414 (1989). While Defendants may find the message of "Let's Go Brandon" offensive, *Morse* warned *Fraser* "should not be read to encompass any speech that could fit under some definition of 'offensive.' After all, much political and religious speech might be perceived as offensive to some." 551 U.S. at 409. *See also Nixon v. N. Loc. Sch. Dist. Bd. of Educ.*, 383 F. Supp. 2d 965, 967, 975 (S.D. Ohio 2005) (granting preliminary injunction against school's ban on t-shirts reading in part "Homosexuality is a sin! Islam is a lie! Abortion is murder!")

In *Nuxoll*, the Seventh Circuit reasoned *Morse* and *Fraser* are substantive offshoots from *Tinker*, prohibiting categories of speech likely to cause disruption. 523 F.3d at 674. "From *Morse* and *Fraser* we infer that if there is reason to think that a particular type of student speech will lead to a decline in students' test scores, an upsurge in truancy, or other symptoms of a sick school—symptoms therefore of substantial disruption—the school can forbid the speech." *Id.* Here, by Defendants' admission, despite *four months* of students wearing "Let's Go Brandon" apparel, the School District experienced no disruption.

This is not surprising. Dr. David Moshman, Plaintiffs' expert in adolescent psychology, explained why: "Children begin recognizing that others can have different ideas than they do about the age of 4." (Ex. 31, Moshman Expert Rep. at 5.) "By the age of 7 or 8 years, if not earlier, children understand that they are responsible for their actions, and by the age of 11 or 12 years they have a deeper understanding of what this entails." *Id.* So "there was no reason for school officials to expect" that "Let's Go Brandon" apparel "would cause disruption." *Id.*

Citing studies on teenage cognitive development, Dr. Moshman explained, "[t]here is no reason to think middle or high school students are any different from adults in their understanding of what it means for someone to have a message on their shirt and how one ought to react to that, or are more likely than adults to react disruptively. Of course any message could possibly lead to unexpected reactions, but this is true regardless of age." *Id.*[11]

Other critical factors distinguish D.A.'s and X.A.'s "Let's Go Brandon" apparel from Mr. Fraser's sexual innuendo-laden assembly speech. The *Fraser* Court noted the speech would have violated the rules of the United States House of Representatives and Senate. 478 U.S. at 682. "Can it be that what is proscribed in the halls of Congress is beyond the reach of school officials to regulate?" *Id.* By contrast, multiple members of Congress have used the "Let's Go Brandon" slogan during floor speeches to convey strong disapproval of President Biden and his legislative initiatives without breaching profanity or decorum rules. *See, e.g.*, 168 Cong. Rec. H5240-05, H5240 (2022) (statement of Rep. Douglas L. LaMalfa); 167 Cong. Rec. H5880-01, H5880 (2021) (statement of Rep. Mary E. Miller); 167 Cong. Rec. H5774-01, H5776 (2021) (statement of Rep. William J. Posey).

What is more, unlike George Carlin's "seven dirty words" monologue which*, Fraser* explained, could be restricted on the radio since it reached an audience

---

[11] Defendants did not name an expert witness, nor did they name a rebuttal expert to challenge Dr. Moshman's conclusions about the effects of "Let's Go Brandon" apparel on the school environment.

including children, "Let's Go Brandon" is omnipresent on terrestrial radio and network television. (*See supra* pp. 7–8.)

The cases the School District cited responding to Plaintiffs' demand letter (Ex. 28, Sch Dist. Resp. Ltr.) highlight why the "Let's Go Brandon" political slogan falls outside *Fraser*'s reach. Each involved squarely proscribable sexual innuendo or messages encouraging illicit drug use.[12] The "Let's Go Brandon" slogan is neither.

Affirming the First Amendment right of students to refuse to stand for the Pledge of Allegiance, the Supreme Court held "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics." *Barnette*, 319 U.S. at 642. Whether the President of the United States or the TCMS Assistant Principal, our First Amendment forever bars the government from assuming the role of "the great censor and director of which thoughts are good for us." *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 330 (7th Cir. 1985).

Yes, schools can stop kids from saying "fuck Joe Biden" during the school day. They can't censor "Let's Go Brandon."

---

[12] *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 471 (6th Cir. 2000) (pre-*Morse*, relying on *Fraser* to bar Marilyn Manson shirts because the artist's lyrics, some of which encouraged drug use, were "vulgar, offensive, and contrary to the educational mission of the school"); *Doninger ex rel. Doninger v. Neihoff*, 527 F.3d 41, 45, 53 (2d Cir. 2008) (school could punish the student for calling school administrators "douchebags"); *Pyle ex rel. Pyle v. S. Hadley Sch. Comm.*, 861 F. Supp. 157, 161–62, 168–70 (D. Mass. 1994) (upholding prohibition on sexual innuendo shirts "Coed Naked Band: Do It To the Rhythm" and "See Dick Drink. See Dick Drive. See Dick Die. Don't be a Dick"); *Broussard ex rel. Lord v. Sch. Bd. of City of Norfolk*, 801 F. Supp. 1526, 1528, 1536–37 (E.D. Va. 1992) (upholding ban on "Drugs Suck!" shirts because the word "suck" had "sexual connotations").

**C.  In the alternative, D.A.'s and X.A.'s "Let's Go Brandon" sweatshirts are protected "ambiguously lewd" political speech.**

D.A. and X.A. engaged in protected nondisruptive political expression when they wore "Let's Go Brandon" sweatshirts to school. As explained above, the "Let's Go Brandon" political slogan is not sexually explicit, lewd, or profane speech under *Fraser*. To the extent, however, the Court believes "Let's Go Brandon" is susceptible to a lewd or profane interpretation, it should follow the en banc Third Circuit's holding in *B.H* that the First Amendment protects "ambiguously lewd" student expression if it "can plausibly be interpreted as commenting on any political or social issue." 725 F.3d at 314 (quoting *Morse*, 551 U.S. at 422 (Alito, J., concurring)).

In *B.H.*, the Third Circuit held middle school students have a First Amendment right to wear breast cancer awareness bracelets with the slogan "I ♥ boobies! (KEEP A BREAST)." *Id.* at 297–98. Rejecting the school's reliance on *Fraser*, the court explained "*Fraser* involved only *plainly* lewd speech" and *Fraser* emphasized the "marked distinction between the political 'message' of the armbands in *Tinker* and the sexual content of Fraser's speech." *Id.* at 302, 307 (quoting *Fraser* 478 U.S. at 680). The Third Circuit concluded *Fraser* stands for the proposition that "[a] school's leeway to categorically restrict ambiguously lewd speech . . . ends when that speech could also plausibly be interpreted as expressing a view on a political or social issue." *Id.* at 309.

Therefore, the *B.H.* court held, because "I ♥ boobies!" bracelets are only "ambiguously" lewd, they retained First Amendment protection since they commented on a social issue. *Id.* at 318, 320. The en banc court explained *Tinker*,

*Fraser*, and *Morse* made it an "open-and-shut case." *Id.* Likewise, here, there is no dispute "Let's Go Brandon" is a political slogan related to President Biden. So even if the Court believes the "Let's Go Brandon" slogan is "ambiguously lewd," it remains firmly within the First Amendment's protection.

### D. Because there is no genuine issue of material fact Defendants censored protected speech, D.A. and X.A. are entitled to summary judgment.

Buikema does not dispute he instructed D.A. and X.A. to remove their "Let's Go Brandon" sweatshirts. (Ex. 7, Buikema Dep. Tr. 51:11–16.) And Bradford testified she told D.A., "you might want to take that [sweatshirt] off," warning D.A., "otherwise, [Assistant Principal] Mr. Buikema is right down the hallway, you can talk to him." (Ex. 26, Bradford Dep. Tr. 34:1–7.) Given the power dynamics of schools, that's an instruction to remove a sweatshirt, not a request. *See generally J.D.B. v. North Carolina*, 564 U.S. 261, 276 (2011) (noting the "coercive effect of the schoolhouse setting" because students' "presence at school is compulsory" and "disobedience at school is cause for disciplinary action"); Paula Denton, *The Power of Our Words: Teacher Language that Helps Children Learn* 14 (2d ed. 2015) ("'Could you all go back to your seats now?' we find ourselves asking, when what we mean is 'Everyone go back to your seats now.'")

The Court should grant Plaintiffs' motion for summary judgment as to liability against Buikema and Bradford (Claim I) and for a permanent injunction and declaratory judgment against the School District's "Let's Go Brandon" ban (Claim III).

II.     **Because *Tinker* Clearly Established Plaintiffs' Right to Wear Political Apparel to School, Buikema and Bradford Are Not Entitled to Qualified Immunity. (Claim I).**

The Court should deny qualified immunity to Buikema and Bradford because they "(1) violated a constitutional right that (2) was clearly established." *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021). *Tinker*, *Fraser*, *Morse*, and *Mahanoy*, plus *B.H.* and *Guiles*, clearly established D.A.'s and X.A.'s right to engage in the "silent, passive expression of opinion, unaccompanied by any disorder or disturbance" of wearing non-profane political apparel to school. *Tinker*, 393 U.S. at 508.

A.      **Viewing the facts in the light most favorable to D.A. and X.A. demonstrates Buikema and Bradford violated their constitutional rights.**

Viewed in the light most favorable to D.A. and X.A., the facts show Buikema and Bradford violated D.A.'s and X.A.'s constitutional rights. The first step in assessing a defendant's request for qualified immunity on summary judgment is to assess whether the facts, "taken in the light most favorable" to D.A. and X.A., show Defendants violated a constitutional right. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (reversing summary judgment qualified immunity dismissal because the lower court "failed to view the evidence . . . in the light most favorable" to the plaintiff).

As shown in Section I, Buikema and Bradford violated D.A.'s and X.A.'s First Amendment rights when they instructed D.A. and X.A. to remove "Let's Go Brandon" apparel despite the lack of substantial disruption caused by the sweatshirts and in the absence of facts which would have allowed them to reasonably forecast substantial disruption. In the light most favorable to D.A. and X.A., these facts show Buikema and Bradford violated their First Amendment rights.

### B.    D.A.'s and X.A.'s First Amendment rights were clearly established at the time of Buikema's and Bradford's conduct.

D.A. and X.A. also satisfy the second prong for defeating qualified immunity because they had a clearly established right to engage in the "silent, passive" expression of wearing political apparel to school. *Tinker*, 393 U.S. at 508.

A constitutional right is clearly established when the contours of constitutional protection are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (cleaned up). In the Sixth Circuit, those contours are established by "binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Id.* (cleaned up). Overcoming qualified immunity "do[es] not require a case directly on point." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). So "a public official c[an] still be on notice that his conduct violates established law even in novel factual circumstances." *Holzemer*, 621 F.3d at 527 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

*Tinker* (1969), *Fraser* (1986), *Morse* (2007), and *Mahanoy* (2021), along with *B.H.* (2013) and *Guiles* (2006), clearly established in the spring of 2022 that Buikema and Bradford could not order D.A. and X.A. to refrain from engaging in the nondisruptive expression of wearing "Let's Go Brandon" political apparel to school.

Start and end with *Tinker*. It clearly established schools may not censor student speech absent "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" or actual substantial disruption or material interference. 393 U.S. at 514. The Court

explained that speech which "cause[s] discussion outside of the classrooms, but no interference with work and no disorder" remains firmly within the First Amendment's protection. *Id.* And *Tinker* clearly established uneasy feelings by school officials about a student's expression do not suffice: "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508. *See also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (denying qualified immunity in student speech dispute, holding *Tinker* gave the defendants "fair warning" they could not punish nondisruptive political expression).

In 1986, *Fraser* clearly established schools may prohibit plainly lewd and sexually explicit speech, particularly when it does not touch upon a matter of political or social concern. 478 U.S. at 685. Then, *Morse* clarified in 2007 schools cannot use *Fraser* to censor "offensive" speech, because "much political and religious speech might be perceived as offensive to some." 551 U.S. at 409. Finally, in 2021, *Mahanoy* reaffirmed *Tinker*'s core promise that America's public schools are "nurseries of democracy" and reminded public school officials "the school itself has an interest in protecting a student's unpopular expression." 141 S. Ct. at 2046. So the decisions after *Tinker* added an additional layer of protection to D.A.'s and X.A.'s "silent, passive" political speech. *Tinker*, 393 U.S. at 508.

Consider also the Third Circuit's en banc *B.H.* and the Second Circuit's decision in *Guiles*. Although out of circuit, they demonstrated *Tinker*, *Fraser*, and *Morse* in action and further cement why qualified immunity is inappropriate here. *B.H.* and

*Guiles* directly addressed the scope of First Amendment rights in public schools post-*Fraser*, holding "I ♥ boobies!" bracelets and a shirt calling the sitting president a "Cocaine Addict" retained full First Amendment protection because the students remained nondisruptive. *B.H.*, 725 F.3d at 320 (calling it an "open-and-shut case"); *Guiles*, 461 F.3d at 330–31 (holding *Tinker* protected the student's shirt because the apparel "did not cause any disruption or confrontation in the school").

*Tinker* alone clearly established D.A.'s and X.A.'s First Amendment right to wear apparel with the "Let's Go Brandon" political slogan to school in a nondisruptive manner. Nothing in *Fraser*, *Morse*, or *Mahanoy* clouded the waters. To the contrary: *Tinker*'s progeny repeatedly re-affirmed the right of students to engage in nondisruptive, non-profane political speech during school hours. The Court should reject Buikema and Bradford's request for qualified immunity.

## III.   Under *Monell*, the School District Is Responsible for Buikema's and Bradford's Constitutional Violations. (Claim II).

The School District is liable under *Monell* for Buikema's and Bradford's constitutional violations because they acted pursuant to the School District's policy and custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Under *Monell*, "A local governmental entity may be held liable under 42 U.S.C. § 1983 for violations of federal law committed pursuant to a governmental "policy or custom." *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999). And "a school district is a local governmental entity." *Id.* at 854. To establish a policy or custom, a student can show (1) evidence of a formal policy officially adopted by the district; or (2) a single,

unconstitutional act or decision taken by an authorized decisionmaker. *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 260 (6th Cir. 2015).

D.A. and X.A. have both. The School District confirmed, in writing, it prohibits students from wearing "Let's Go Brandon" apparel and ratified Buikema's and Bradford's decisions enforcing that ban. (Ex. 28, Sch Dist. Resp. Ltr.) And even without the School District's written confirmation of its "Let's Go Brandon" ban, Buikema and Bradford are authorized decisionmakers.

The School District formally approved the dress code banning "lewd, indecent, vulgar, or profane" apparel (Ex. 10, 30(b)(6) Dep. Tr. 21:21–22:4,) and it has repeatedly confirmed that rule prohibits "Let's Go Brandon" attire. Responding to D.A. and X.A.'s cease and desist letter, the School District wrote, "The District prohibits clothing or styles of expression that are vulgar or profane. . . . 'Let's Go Brandon' is a transparent code for using profanity against the President." (Ex. 28, Sch Dist. Resp. Ltr. at 1.) And in its interrogatory responses, the School District asserts "'Let's Go Brandon' means 'fuck,' . . . . 'Fuck' is a vulgar, pornographic and profane term that means to fornicate." (Ex. 32, Sch. Dist. Resp. to Pls.' Interrog. No. 4.) Buikema and Bradford were simply enforcing the School District's policy.

Not only does the School District have a policy banning "Let's Go Brandon" apparel, it affirmatively ratified Buikema's and Bradford's instructions to D.A. and X.A. to remove their sweatshirts. Under *Monell*, "i[f] the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Feliciano v. City of*

*Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion). Ratification differs from respondeat superior liability because ratification demonstrates after-the-fact "affirmative approval" of a discretionary decision, rather than the silent acquiescence of refusing to intervene and overturn a decision. *Id.*

Here, D.A. and X.A. expressly raised the "Let's Go Brandon" prohibition to the School District (Ex. 27, C&D Ltr.,) and the School District confirmed their administrators and teachers correctly applied School District policy. (Ex. 28, Sch Dist. Resp. Ltr.) So even if the School District had not placed its "Let's Go Brandon" ban in writing, (*id.*,) it still ratified Buikema's and Bradford's actions. That makes the School District liable for their constitutional violations. *See, e.g.*, *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F. 4th 529, 535 (4th Cir. 2022) (holding student stated a claim under *Monell* because school board ratified subordinate officials' decisions).

Even had the School District not adopted, enforced, and ratified a ban on "Let's Go Brandon" apparel, it would remain liable under *Monell* because it delegated complete dress code enforcement authority to administrators and staff. A single official's actions create liability for a local government entity when that official has "final policymaking authority." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). The School District's deposition testimony, and its administrators' testimony, confirmed school administrators and teachers have final authority regarding dress code enforcement.

33

School administrators are the final arbiters of the dress code. They have complete authority to monitor students for violations, determine what apparel is prohibited, and address violations as they see fit. (Ex. 10, 30(b)(6) Dep. Tr. 59:10–60:4.) The School District does not second-guess administrators' dress code determinations, and administrators do not need the School Board's approval to discipline students for violations. (*Id.* 59:10–16, 70:4–71:5.) That means the School District remains bound by, and responsible for, the First Amendment violations carried out by those it designated to exercise complete, unreviewable authority over its enforcement. The Court should award Plaintiffs summary judgment on Claim II.

## IV. The Dress Code Provision Barring Attire Which "Calls Undue Attention to Oneself" Is Void for Vagueness. (Claim IV).

The School District's dress code rule prohibiting students from wearing apparel which "calls undue attention to oneself" is void for vagueness. A speech restriction is unlawfully vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). "The void-for-vagueness doctrine is concerned with two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 422 (6th Cir. 2014) (cleaned up). The doctrine "finds its roots in the Due Process Clause, as well as the First Amendment." *Smith ex rel. Smith v. Mount Pleasant Pub. Schs.*, 285 F. Supp. 2d 987,

992 (E.D. Mich. 2003) (finding school's verbal assault policy unconstitutionally vague and overbroad).

Vague laws are a paramount First Amendment concern because they cause Americans to self-censor in an effort to "steer far wider of the [prohibited] zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). As a result, "laws dealing with speech are subject to stringent vagueness standards." *Boddie v. Am. Broad. Cos., Inc.*, 881 F.2d 267, 272 (6th Cir. 1989) (cleaned up) (citing *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)). True, student policies are not held to the same standard as criminal statutes. But schools must still provide students enough information to know how to stay on the right side of the rules. *See, e.g.*, *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698, 704 (W.D. Pa. 2003) (holding void for vagueness student handbook policies using terms "abuse, offend, harassment, and inappropriate" because the terms "are simply not defined in any significant manner").

The prohibition on apparel "calling undue attention to oneself" is unconstitutionally vague. Clothing is not just utilitarian, it (especially among teenagers) is a way to express individuality. *See generally* Susan B. Kaiser, The Social Psychology of Clothing and Personal Adornment 314–15 (1985). Indeed, "[c]lothing represents a form of communication over which we can exert a great deal of control," and clothing choice "is one way in which we can draw attention to ourselves." *Id.* at 315. But the School District says if a student's clothing draws *too much* attention, it is banned.

The School District does not explain how much attention is "undue attention." Wearing the rival school's jersey during homecoming week would attract attention. Is it "undue" attention? Likewise, a student wearing a shirt expressing support for a political or social cause may intend for the apparel to draw attention and spark a conversation or debate with classmates. These discussions, *Tinker* explained, are "not only an inevitable part of the process of attending school; [they are] an important part of the educational process." 393 U.S. at 512. But now, if a student's political or social apparel draws "undue" attention and sparks *too much* conversation, it is prohibited.

The rule provides parents and students no guidance to know how to stay within the rules and no guardrails for administrators and teachers to shield students from arbitrary enforcement. Indeed, when Plaintiffs asked TCHS Principal Goheen to explain the difference between "attention" and "undue attention," he responded, "[y]ou'd have to ask the student that question. They'd probably all have a different opinion on what that means." (Ex. 13, Goheen Dep. Tr. 33:1–19.)

Not to worry, says the School District. Apparel only attracts "undue" attention if it causes others to be "disruptive." (Ex. 10, 30(b)(6) Dep. Tr. 64:25–65:9.) First, as explained in Section V, *Tinker* requires "substantial disruption," not mere "disruption," so the explanation fails at the constitutional starting gate. *Mahanoy*, 141 S. Ct. at 2045 (citing *Tinker* 393 U.S. at 513). Second, the School District's explanation is circular and can only be applied using predictive hindsight about *others'* reactions. It provides parents and students no guidance about how to stay

within the rule; rather, it leaves them guessing whether the message on a day's outfit will cause too much of a stir.

If the School District's rule survives, it will be the unpopular and unorthodox opinions on the losing end. Students wearing apparel with "safe" opinions and messages, largely supported by their fellow students, need not worry their clothing will cause a fuss. But students wishing to present views cutting against prevailing wisdom or who seek to spark a discussion or debate against a generally accepted opinion may well self-censor, fearing their opinion would attract "undue" attention. *Mahanoy* stressed the importance of "protect[ing] the 'marketplace of ideas,'" which "include[s] the protection of unpopular ideas, for popular ideas have less need for protection." 141 S. Ct. at 2046. And the Court has explained the First Amendment "may indeed best serve its high purpose when" unpopular views stir spirited discussions and arguments. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). Without this Court's intervention, the First Amendment cannot serve that high purpose in west Michigan's public schools. *See also Tinker*, 393 U.S. at 508–09 (citing *Terminiello*, calling spirited arguments "the basis of our national strength.")

The School District's ban on apparel calling "undue attention to oneself" is standardless for students, boundless for government enforcers, and toxic to the marketplace of ideas. The Court should permanently enjoin the rule.

## V.   The Dress Code Provision Barring Attire Which "Calls Undue Attention to Oneself" Is Unconstitutionally Overbroad. (Claim V).

The School District's ban on attire which "calls undue attention to oneself" is substantially overbroad under the First Amendment because it "'reaches a

substantial number of impermissible applications' relative to [its] legitimate sweep." *Deja Vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 387 (6th Cir. 2001) (quoting *New York v. Ferber*, 458 U.S. 747, 771 (1982)). The overbreadth doctrine "is predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear" of violating the law. *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989). "Therefore, any law imposing restrictions so broad that it chills speech outside the purview of its legitimate regulatory purpose will be struck down." *Deja Vu*, 274 F.3d at 387.

The "legitimate sweep" of a school policy regulating the content of student expression starts and ends with speech that (1) causes, or is reasonably forecast to cause, material disorder, substantial disruption, or an invasion of the rights of others, (2) carries the imprimatur of the school, (3) contains overt vulgarity or sexual innuendo, or (4) promotes illegal drug use. *Mahanoy*, 141 S. Ct. at 2045–46. The dress code ban on attire "which calls undue attention to oneself" reaches well beyond these shores.

First, it impermissibly bans clothing which causes a "disruption," instead of a "substantial disruption" as required by *Tinker*. *Flaherty* is instructive. 247 F. Supp. 2d 698. There, the court invalidated a student handbook rule against "student[] expression that is abusive, offending, harassing, or inappropriate, 'interferes with the educational program of the schools,' but d[id] not limit it to those circumstances that cause a substantial disruption to school operations." *Id.* at 704. The court explained,

"[a]bsent said language, I can find no way to reasonably construe the Student Handbook policies to avoid this constitutional problem. Therefore, said policies are unconstitutionally overbroad." *Id.*; *see also Saxe*, 240 F.3d at 216–17 (Alito, J.) (holding school's anti-harassment policy unconstitutional because it prohibited student speech falling short of *Tinker*'s "substantial disruption" standard).

Second, even if the School District's "disruption" limiting principle were credited, it means the School District has baked an unconstitutional heckler's veto into its dress code. It would condition one student's free speech rights on the reaction of another, even if the reaction did not constitute substantial disruption under *Tinker*. But *Tinker* made clear that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." 393 U.S. at 508; *see also id.* at 509 ("[A] mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" cannot justify prohibition); *Mahanoy*, 141 S. Ct. at 2056 n.17 (Alito, J., concurring) (noting if the *Tinker* school permitted censoring the protest armbands due to the unruly reaction from those who disagreed with the protest, it would amount to a "heckler's veto").

The Sixth Circuit has been crystal clear that "a review of Supreme Court precedent firmly establishes that the First Amendment does not countenance a heckler's veto." *Bible Believers*, 805 F.3d at 248–55 (collecting cases). The court views a heckler's veto as a "type of odious viewpoint discrimination," *id.* at 248, amounting to the government "favor[ing] the rights of one private speaker over those of another," *id.* (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995)).

But "the freedom to espouse sincerely held religious, political, or philosophical beliefs, especially in the face of hostile opposition, is too important to our democratic institution for it to be abridged simply due to the hostility of reactionary listeners who may be offended by a speaker's message." *Id.* at 252. So too here. The School District's "undue attention" rule conditions what students can wear not on the character or content of the apparel, but on other students' reactions to the apparel. That's a heckler's veto, and it is unconstitutional and repugnant to free speech.

The School District's "undue attention" rule sweeps into its grasp a substantial amount of constitutionally protected speech: student expression causing a stir but not "substantial disruption" under *Tinker*, and it enshrines a heckler's veto to boot. The Court should grant Plaintiffs summary judgment on Claim V.

## CONCLUSION

D.A. and X.A. respectfully request the Court grant their motion and award them summary judgment as to liability on Claims I and II and summary judgment on Claims III, IV, and V.


Dated: March 22, 2024                    Respectfully submitted,

/s/ Conor T. Fitzpatrick
CONOR T. FITZPATRICK
(Mich. P78981 / D.C. 90015616)
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, D.C. 20003
(215) 717-3473
conor.fitzpatrick@thefire.org

KELLEY BREGENZER
(NY. Bar No. 5987482)
FOUNDATION FOR INDIVIDUAL
    RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
kelley.bregenzer@thefire.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2024, I transmitted a true and correct copy of the foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record. I further certify I dispatched a copy of the media exhibits to the Clerk's office for incorporation into the record and transmitted the same to all counsel of record.

*/s/ Conor T. Fitzpatrick*
Conor T. Fitzpatrick

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.2(b)(ii), I hereby certify this brief contains 10,800 words, as calculated by Microsoft Word version 16.83, and therefore falls within the L.R. 7.2(b)(i) word limit of 10,800 words for a brief filed in support of a dispositive motion.

*/s/ Conor T. Fitzpatrick*
Conor T. Fitzpatrick