UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

D.A. a minor, by and through his mother )
B.A., and X.A., a minor, by and through )
his mother, B.A., )
                        Plaintiffs, )
                                        )        No. 1:23-cv-423
-v-                                     )
                                        )        Honorable Paul L. Maloney
TRI COUNTY AREA SCHOOLS, *et al.*,      )
                        Defendants.     )
_____)

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, two students at the Tri County Middle School in Newaygo County, Michigan, wore sweatshirts to school bearing the phrase "Let's Go Brandon."  A school official had the students take off the sweatshirts because the official interpreted the phrase as having a profane meaning.   Plaintiffs sued, asserting that the phrase enjoyed First Amendment protection as political speech.  The parties filed cross motions for summary judgment.  The Court finds that school officials reasonably interpreted the phrase as containing a profane message and will grant Defendants' motion.

### I.

A trial court should grant a motion for summary judgment only in the absence of a genuine dispute of any material fact and when the moving party establishes it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that no genuine issues of material fact exist.  *Celotex Crop. v. Catrett*, 477 U.S. 317,

324 (1986).  To meet this burden, the moving party must identify those portions of the pleadings, depositions, answers to interrogatories, admissions, any affidavits, and other evidence in the record, which demonstrate the lack of genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018).  The moving party may also meet its burden by showing the absence of evidence to support an essential element of the nonmoving party's claim.  *Holis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 543 (6th Cir. 2014).

When faced with a motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Pittman*, 901 F.3d at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  The court must view the facts and draw all reasonable inferences from those facts in the light most favorable to the nonmoving party.  *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018) (citing *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In resolving a motion for summary judgment, the court does not weigh the evidence and determine the truth of the matter; the court determines only if there exists a genuine issue for trial.  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).  The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

## II.

The parties generally agree about the relevant material facts.  The parties disagree about the proper interpretation of legal authority and application of the legal principles to the facts.

Before summarizing the specific events underlying the causes of action in this lawsuit, the Court offers the following background story for context.  In October 2021, Brandon Brown won a NASCAR race in Talladega, Alabama.  Shortly after the race, Brown appeared live on camera with a reporter for the television network covering the event.  The crowd in the background could be heard shouting "F*** Joe Biden."  The reporter stated that the crowd was chanting "Let's Go Brandon."  The reporter's inaccurate description subsequently appeared on all sorts of merchandise including bumper stickers and clothing.

The events giving rise to this lawsuit occurred during the 2021-2022 school year, more specifically in the spring semester of 2022.  At that time, D.A. and X.A. both attended Tri County Middle School (TCMS) in the sixth and eighth grades respectively.  B.A. is D.A. and X.A's mother.  For Christmas in 2021, D.A. and X.A. received, as gifts from B.A., sweatshirts with the phrase Let's Go Brandon written across the front (ECF No. 39-6 B.A. Dep. at 7 PageID.599.)  B.A. acknowledged seeing the video of the interview with Brandon Brown before giving the sweatshirts to her children (*id.* at 7-8 PageID.599).

D.A. and X.A. wore their sweatshirts to school on separate occasions.  In February 2022, D.A. wore his sweatshirt to school.  Defendant Andrew Buikema, then the assistant principal, approached D.A. in the hallway.  Buikema testified that he first asked D.A. if D.A. knew what the phrase meant, to which D.A. replied "no" (ECF No. 38-4 Buikema Dep. at

67 PageID.433).[1]  After explaining the meaning of the phrase to D.A., Buikema informed D.A. that he would have to take the sweatshirt off (*id.*).[2]  And, because D.A. wore a t-shirt with the same phrase under the sweatshirt, Buikema directed D.A. to get another shirt from the school social worker (*id.*).  At his deposition, D.A. admitted that he thought the phrase was funny because it meant F * * * Joe Biden (ECF No. 38-2 D.A. Dep. at 11-12 PageID.404.)  D.A. complied with Buikema's instructions (Buikema Dep. at 67 PageID.433).  No one from the school called D.A.'s mother (*id.*).  D.A. did not receive any discipline and did not miss any school (*id.*; D.A. Dep. at 13 PageID.405).

D.A. wore the sweatshirt to school a second time. Wendy Bradford, a teacher at TCMS, saw D.A. in the hall and suggested to D.A. that he might want to take the sweatshirt off (ECF No. 38-5 Bradford Dep. at 33-34 PageID.445-46).  She pointed out that assistant principal Buikema was down the hallway (*id.* at 34 PageID.446).  Bradford had concerns that D.A. did not know what the phrase on the sweatshirt meant, but she did not ask D.A. about his knowledge of the phrase (*id.* at 36 PageID.446).  At his deposition, D.A. initially testified that he was asked to remove the sweatshirt but then testified that could not remember exactly what Bradford said (D.A. Dep. at 14 PageID.405). D.A. testified that he did end up taking the sweatshirt off (*id.* at 14-15 PageID.405).

---

[1]    At his deposition, D.A. acknowledged that he had seen the video of the Brandon Brown interview before he received the sweatshirt as a gift.  (ECF No. 38-2 D.A. Dep. at 11 PageID.404).

[2]    D.A. testified that Buikema told D.A. to take off the sweatshirt before explaining the meaning of the phrase to D.A. (D.A. Dep. at 12 PageID.404).  The discrepancy in the testimony about the chronological order of the inquiry and the directive do not make a material difference for the purpose of the cross motions.

X.A. wore his sweatshirt to TCMS sometime in the spring of 2022.  X.A. testified that during the first hour he was called to the principal's office (ECF No. 38-3 X.A. Dep. at 10 PageID.412).   X.A. recalled that Buikema stated that X.A. should not be wearing the sweatshirt and asked X.A. if X.A. would take the sweatshirt off (*id.*)  X.A. did take the sweatshirt off (*id.*).  Buikema testified that he explained to X.A. that the phrase had a profane double meaning (Buikema Dep. at 66 PageID.433).[3]   At his deposition, X.A. admitted to viewing the Brandon Brown interview video before receiving the sweatshirt as a gift (X.A. Dep. at 8 PageID.411).  He agreed that he thought the phrase was funny because it meant F*** Joe Biden (*id.* at 9 PageID.411).  X.A. did not receive detention, was not suspended, and did not miss any school as the result of his interaction with Buikema (*id.* at 10-11 PageID.411).

Buikema testified that students can wear clothing with political messages at TCMS (Buikema Dep. at 19 PageID.421.)  He recalled one student wearing a MAGA hat (*id.*). Bradford recalled seeing students wear Biden shirts and Trump shirts (Bradford Dep. at 11 PageID.440).  D.A. recalled seeing at least one person at school wearing Make America Great Again clothing (D.A. Dep. at 15 PageID.405).  X.A. also recalled seeing MAGA clothing and Trump 2024 clothing at school (X.A. Dep. at 11 PageID.412).

On May 27, 2022, through counsel, Plaintiffs sent a cease and desist letter to the Tri County School District (ECF No. 39-38 PageID.711).  The letter asserted that the staff at

---

[3]        X.A. denies that Buikema asked X.A. if he knew what the phrase on the sweatshirt meant (X.A. Dep. at 10 PageID.411).  The discrepancy in the testimony does not create a genuine issue of material fact for the purpose of the cross motions.

TCMS had violated D.A.'s and X.A.'s First Amendment rights by restricting their ability to display political messages on clothing (*id.* at 712).  The letter further demanded that the School District issue a public statement clarifying the dress policy or, if necessary, amend the dress policy to respect the First Amendment rights of students (*id.*).

On June 9, 2022, through counsel, the School District responded by letter (ECF No. 39-29 PageID.715).  The letter explained that the School District prohibits vulgar or profane clothing (*id.*).  The letter further explained that the phrase Let's Go Brandon has a commonly understood meaning that contains profanity (*id.*).  The School District insisted that it could, consistent with the First Amendment, restrict clothing displaying offensive, vulgar or profane messages, including messages that contain transparent codes for profanity (*id.*).  The School District declined to issue any public statement or to amend the Code of Conduct or Dress Code policy (*id.* PageID.718).

In April 2023, Plaintiffs filed this lawsuit.  Plaintiffs sued the Tri County Area Schools and Buikema and Bradford in their individual capacities.  The complaint includes five causes of action.  In Count I, Plaintiffs plead a violation of the freedom of speech under the First Amendment and seek damages.  Both Plaintiffs bring the claim against Buikema and D.A. also brings the claim against Bradford.  In Count II, Plaintiffs plead a *Monell* claim and seek to hold the Tri County Area Schools liable for a violation of Plaintiffs' First Amendment rights.  In Count III, Plaintiffs seek injunctive and declaratory relief against Tri County Area Schools for a violation of Plaintiffs' First Amendment rights. In Count IV, Plaintiffs seek injunctive and declaratory relief against the Tri County Area Schools and assert a vagueness claim under the First and Fourteenth Amendments.  Specifically, Plaintiffs assert a facial

challenge to a portion of the dress code that prohibits apparel that is disruptive to the environment by calling undue attention to oneself.  Finally, in Count V Plaintiffs seek injunctive and declaratory relief under the First Amendment and assert an overbreadth claim to the same disruptive and undue attention provision.

### III.

Defendants advance three reasons to dismiss part or all of the lawsuit unrelated to the merits of Plaintiffs' claims.

### A.

Defendants argue that the Court should dismiss the lawsuit for lack of jurisdiction. Defendants assert that Plaintiffs did not seek leave to proceed under pseudonyms. Defendants cite *Citizens for a Strong Ohio v. Marsh*, 123 F. App'x 630, 636-37 (6th Cir. Jan 3, 2005).

The Court denies Defendants' request to dismiss this lawsuit for lack of jurisdiction. The Federal Rules of Civil Procedure instruct that when parties file documents that include the name of a minor, the filing should use only the minor's initials.  Fed. R. Civ. P. 5.2(a)(3). The use of initials for the two minors satisfies the requirement in Rule 10(a) that the title of the complaint must name all of the parties.  The Sixth Circuit has declined to extend the outcome in *Marsh*—which did not involve an underaged party—to a lawsuit where the plaintiffs were minors.  *See Doe v. Boland*, No. 21-3517, 2022 WL 2053256, at *2 (6th Cir. Mar. 2, 2022).

The Court declines to dismiss the lawsuit because the mother, B.A., failed to seek leave to proceed anonymously.  In a recent unpublished opinion, the Sixth Circuit at least

questioned the legal rule in *Marsh* (also an unpublished opinion) that a party's failure to seek leave to proceed anonymously deprives the court of jurisdiction. *Koe v. Univ. Hosps. Health Sys., Inc.*, No. 22-3952, 2024 WL 1048184, at *3 (6th Cir. Mar. 8, 2024). A court's subject matter jurisdiction derives from the case or controversies language in Article III § 2 of our constitution. *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 102 (1998). Neither the *Marsh* opinion nor the authority cited in that opinion provides a coherent rational for why the sort of party anonymity involved in this lawsuit implicates a court's constitutional power to resolve cases and controversies. In this lawsuit, Defendants know the identifies of the minors and their mother. If the anonymity issue implicates this Court's subject matter jurisdiction, the matter cannot be waived and could be raised at any time. *See Ammex, Inc. v. Cox*, 351 F.3d 697, 702 (6th Cir. 2003). But, if the anonymity issue implicates some other fairness or privacy concern, that issue might be waivable.

District courts have discretion to permit a party to proceed anonymously. *Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). By proceeding anonymously, B.A. protects the privacy of her children. Plaintiffs informed Defendants of the identity of both minors and their mother shortly after filing the lawsuit (ECF No. 44-2 PageID.819). Defendants have not identified any prejudice resulting from the use of initials for the mother. Defendants have deposed both minors and their mother. The Court finds Defendants waived any objection to B.A. proceeding anonymously.

## B.

Defendants argue Plaintiffs lack standing and also argue that some of relief requested by Plaintiffs has become moot. Defendants contend that Plaintiffs lack standing to seek

declaratory or injunctive relief against a ban on Let's Go Brandon apparel because no such ban exists.  Concerning the provision of the dress code that Plaintiffs identify for their overbreadth and vagueness causes of action, Defendants argue that Plaintiffs lack standing to bring the claim and that the claims are moot.

1.

In the prayer for relief, Plaintiffs seek a "permanent injunction enjoining the School District from enforcing a categorical ban on 'Let's Go Brandon' apparel" and also a declaration that "the School District's ban on 'Let's Go Brandon' apparel violates the First Amendment" (ECF No. 1 PageID.27-28).  For Count III, Defendants assert Plaintiffs lack standing to seek this relief because no such ban exists.

The Court concludes Plaintiffs have standing to seek a declaration and an injunction concerning their ability to wear apparel with the phrase Let's Go Brandon.  Without dispute, D.A. and X.A. wore Lets Go Brandon apparel and were asked or instructed to remove the apparel by a member of the school administration.  Plaintiffs contend that the First Amendment prohibits the school from making that request or demand.  Should Plaintiffs prevail, the Court could enter a declaration and an appropriate injunction reflecting the evidence presented during this litigation.

Plaintiffs do not dispute Defendants' argument that the School District does not have a categorical ban on Let's Go Brandon apparel.  In their response, Plaintiffs insist that the lack of a written policy banning Let's Go Brandon apparel does not undermine standing for their ability to seek declaratory and injunctive relief (ECF No. 44 PageID.811).  Plaintiffs assert their injuries were caused by Defendants' enforcement of the dress code and seek

appropriate relief tailored to Plaintiffs' injuries.  To the extent Plaintiffs seek injunctive and declarative relief from a categorical ban, Plaintiffs have abandoned that particular prayer for relief.

2.

Plaintiffs seek "a permanent injunction against the School District's policy prohibiting apparel 'disruptive to the teaching and/or learning environment by call undue attention to oneself'" (ECF No. 1 PageID.28).  Plaintiffs also seek a declaration that the same provision violates the First and Fourteenth Amendments (*id.*).

In their motion, Defendants argue that the relevant causes of action and these prayers for relief are moot.  On March 11, 2024, the School District's Board approved a revised version of the dress code that removed the disputed language (ECF No. 38-10 Mar. 3, 2024, minutes PageID.517-18).  Defendants attach the 2023-2024 student handbook that contains a revised dress code effective March 2024 (ECF No. 38-9 PageID.508).  Plaintiffs do not address this mootness argument in their response to Defendants' motion.

Plaintiffs have waived any cause of action and prayer for relief based on the disruptive and undue attention language.  Defendants properly raised the mootness argument in their motion for summary judgment.  By not addressing the argument in their response, Plaintiffs waive the argument.  *See Alexander v. Carter*, 733 F. App'x 256, 261 (6th Cir. 2018) ("When a plaintiff fails to address a claim in response to a motion for summary judgment, the claim is deemed waived.")  (internal quotation marks and edits omitted) (citing *Haddad v. Sec'y, U.S. Dept. of Homeland Sec.*, 610 F. App'x 567, 568-69 (6th Cir. 2015)); *see, e.g., Notredan, LLC v. Old Republic Exchange Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013)

("Notredan's response to the motion to dismiss did not address this argument. This failure amounts to a forfeiture of the fiduciary-duty claim.").

The Court will dismiss Counts IV and V as moot.

## IV.

Both parties seek summary judgment on Plaintiffs' claim that Defendants' actions violated the First Amendment.

Our Supreme Court has offered guidance for First Amendment free speech claims brought by students.[4] The opinions do not address all possible factual scenarios but the combination of the opinions offers lower courts a place to begin their analysis.[5] In *Morse v. Frederick*, 551 U.S. 393 (2007), Chief Justice John Roberts offered a succinct summary of the basic legal framework for student speech.

> Our cases make clear that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969). At the same time, we have held that the "constitutional rights of students in public school are not automatically coextensive with the rights of adults in other

---

[4] The specific holdings in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), which involved school newspaper and school sponsored speech, and *Mahanoy Area School District v. B.L.*, 594 U.S. 180 (2021), which involved off-campus student speech, do not implicate the factual situation here.

[5] The Second Circuit noted the "ambiguity in the Supreme Court's jurisprudence" for student speech and wrote that "'[t]he law governing restrictions on student speech can be difficult and confusing, even for lawyers, law professors, and judges.'" *Radwan v. Manuel*, 55 F.4th 101, 120 (2d Cir. 2022) (citation omitted). In a footnote in an *en banc* opinion, the Fourth Circuit commented that "the Supreme Court's student-speech jurisprudence might fairly be described as opaque." *B.H. v. Easton Area Sch. Dist.*, 725 F.3d 293, 302 n.7 (4th Cir. 2013) (*en banc*) (citations omitted). Also in an *en banc* opinion considering qualified immunity for school principals, the Fifth Circuit described the relevant jurisprudence as "a complicated body of law that seeks, often clumsily, to balance a number of competing First Amendment imperatives." *Morgan v. Swanson*, 659 F.3d 359, 365 (5th Cir. 2011) (*en banc*). The Seventh Circuit found that "[m]any aspects of the law with respect to student speech, ... , are difficult to understand and apply[.]" *Hosty v. Carter*, 412 F.3d 731, 739 (7th Cir. 2005).

settings," *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), and the rights of students "must be 'applied in light of the special characteristics of the school environment,'" *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker, supra*, at 506).

*Id.* at 396-97. In each situation, a court must consider both the First Amendment interests of the students and the educational mission of the schools. *See Tinker*, 393 U.S. at 507; *see, e.g., Melton v. Young*, 465 F.2d 1332, 1334 (6th Cir. 1972) ("This is a troubling case; on the one hand we are faced with the exercise of the fundamental constitutional right to freedom of speech, and on the other with the oft conflicting but equally important, need to maintain decorum in our public schools so that the learning process may be carried out in an orderly manner.").

*Tinker* involved a situation where students engaged in political expression. School officials learned that students intended to wear black armbands as a form of protest against this country's involvement in the military conflict in Vietnam. The principals of the schools adopted a policy that any student wearing an armband would be asked to remove it and, if the student refused, the student would be suspended and could return to school only without the armband. Two days later, the schools sent home the three plaintiffs, two high school students and one middle school student, who wore black arm bands to school. The Court found that "school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance ...." *Tinker*, 393 U.S. at 508. The Court also found that the events did "not concern speech or action that intrudes upon the work of the schools or the rights of other students." *Id.* As a result, the Court found that the wearing of the armbands "was closely akin to 'pure speech'" which was

"entitled to comprehensive protection under the First Amendment." *Id.* at 505-06. The Court explained that "[i]n the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id.* at 511.

In *Fraser*, the student engaged in speech not protected by the First Amendment. *Castorina ex rel. Rewt v. Madison Cty. Sch. Bd.*, 246 F.3d 536, 540 (6th Cir. 2006). At a high school in Pierce County, Washington, student Matthew Fraser delivered a speech nominating a fellow student for an elected office. Fraser gave the speech at a school assembly. The school required students, some as young as 14 years old, to either attend the assembly or report to study hall. Fraser's speech described the candidate using "an elaborate, graphic, and explicit sexual metaphor." *Fraser*, 478 U.S. at 678. The school had a rule against conduct that interfered with the educational process, "including the use of obscene, profane language or gestures." *Id.* The school suspended Fraser, who later sued. The Court reasoned that it had "recognized an interest in protecting minors from exposure to vulgar and offensive spoken language." *Id.* at 684. And, the Court found that "it is a highly appropriate function of a public school education to prohibit the use of vulgar and offensive terms in public discourse." *Id.* The Court held that "schools, as instruments of the state, may determine that the essential lessons of civil, mature conduct cannot be conveyed in a school that tolerates lewd, indecent, or offensive speech and conduct[.]" *Id.* at 683.

In *Morse*, the student displayed a message promoting an illegal activity. The events occurred outside of a high school in Juneau, Alaska. Students were permitted to leave class to observe the Olympic Torch Relay as the torchbearers ran by the school. As the runners

and camera crews passed by, several students unfurled a large banner displaying the phrase
"BONG HiTS 4 JESUS."   The School Board had a policy prohibiting public expression
that advocates the use of substances that are illegal for minors.  When the principal saw the
banner, she demanded the students take it down because she interpreted the banner as
encouraging the use of illegal drugs.  All students involved except for the plaintiff complied
and the principal subsequently suspended the plaintiff.  The Supreme Court acknowledged
that the message on the banner was "cryptic."  *Morse*, 551 U.S. at 401.  Nevertheless, the
Court held that the principal's interpretation, that the banner promoted illegal drug use, was
"plainly a reasonable one."  *Id.*  The Court recognized the importance of deterring drug use
by children as an "'important—indeed, perhaps compelling' interest."  *Id.* at 407 (quoting
*Veronica Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661 (1995)).  The Court noted that
"Congress has declared that part of a school's job is educating students about the dangers of
illegal drug use."  *Id.* at 408.  The unique characteristics of the school environment and the
government's interest in stopping student drug use "allow schools to restrict student
expression they reasonably regard as promoting illegal drug use."  *Id.*

A little more than a year after *Morse*, in *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008),
the Sixth Circuit summarized the guiding principles found in the Supreme Court opinions
concerning student speech.  First, "under *Fraser*, a school may categorically prohibit vulgar,
lewd, indecent, or plainly offensive student speech[.]"  *Id.* at 563-64 (citations omitted).
Second, "under *Hazelwood*, a school has limited authority to censor school-sponsored
student speech in a manner consistent with pedagogical concerns[.]"  *Id.* at 564 (citations
omitted).  Third, "the *Tinker* standard applies to all other student speech and allows

regulation only when the school reasonably believes that speech will substantially interfere with schoolwork or discipline[.]" *Id.* (citations omitted).

Then, in 2010 in *Defoe ex rel. Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010), the Sixth Circuit called into question the rigidity of the three categories described in *Barr*. Judge Rogers, writing for the majority, suggested that the broad description of the third category—all student expression not covered by the first and second categories—was not necessary to the decision in *Barr*. *Id.* at 341. Reading the combination of *Tinker*, *Fraser*, and *Morse*, Judge Rogers concluded that the *Tinker* approach is not absolute and schools do not always have to show a substantial disruption in student speech cases. *Id.* at 340, 342. Following *Defoe*, at least in this circuit,

> the general rule is that school administrators can limit speech in a reasonable fashion to further important policies at the heart of public education. *Tinker* provides the exception—schools cannot go so far as to limit nondisruptive discussion of political or social issues that the administration finds distasteful or wrong. Drawing such a line may be difficult, but it must be left as a practical matter first to school administrators, with resort to the courts always available for cases like *Tinker* where the school goes too far.

*Id.* at 342.

## V.

The dispute between the parties, and the issue central to the cross motions for summary judgment, concerns whether the phrase Let's Go Brandon falls under *Tinker* as "closely akin to 'pure speech,'" *Tinker*, 393 U.S. at 505, or whether the phrase falls under *Fraser* because it constitutes "lewd, indecent, or offensive speech," *Fraser*, 478 U.S. at 683, or somewhere in between the two. For the reasons provided below, the Court concludes the School District can restrict students from wearing Let's Go Brandon apparel.

A.

In school speech cases where a school limits or restricts a student's expression, courts must determine whether the school's interpretation of the expression is reasonable. *Morse*, 551 U.S. at 401. The majority agreed that the message on the banner was "cryptic" and would be offensive to some, humous to others, and for some nonsensical. *Id.* For a school's interpretation to be reasonable, the interpretation must be more than a mere possibility. *Id.* at 402 ("Gibberish is certainly a possible interpretation of the words on the banner, but it is not the only one, and dismissing the banner as meaningless ignores the undeniable reference to illegal drugs."). The student's expression must be considered in the proper context but the student's motivation or subjective intent is irrelevant. *Id.* The court does not substitute its judgment for that of the school administrator. *Kutchinski v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 360 (6th Cir. 2023) (citations omitted). The court's task is to determine if the school's interpretation is reasonable, because the "'determination of what manner of speech in the classroom or school assembly is inappropriate properly rests with the school board.'" *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 109 F.4th 453, 462 (6th Cir. 2024) (quoting *Fraser*, 478 U.S. at 683).

The parties present the Court with two interpretations of Let's Go Brandon. Plaintiffs argue the phrase functions as a way of expressing disagreement with the Biden Administration. Defendants argue the phrase conveys a profane and vulgar message in reference to President Biden.

## B.

Defendants argue that TCMS can regulate student apparel bearing the phrase Let's Go Brandon as profane because the phrase means F * * * Joe Biden.

Defendants have established that a reasonable interpretation of the phrase Let's Go Brandon is that it conveys a profane and vulgar message with reference to President Joe Biden.[6]  The parties agree that TCMS's dress code prohibits clothing with vulgar or profane messages (ECF No. 38 Pl. Brief at 4 PageID.369; ECF No. 39 Pl. Br. at 4 PageID.537). Buikema testified that the dress code prohibits students from wearing attire with messages or illustrations that are lewd, indecent, vulgar or profane (Buikema Dep. at 20 PageID.421). He testified that the prohibition on profane messages refers to inappropriate swear words (*id.* at 30 PageID.424).  The parties agree about the origin of Let's Go Brandon (ECF No. 38 at 1 PageID.366; ECF No. 39 at 6 PageID.539).  It began as a cheer using a swear word.

The evidence in the record establishes that Plaintiffs and Defendants understood that the phrase referenced the profane chant at the NASCAR event.  Before wearing the sweatshirts, both D.A. and X.A. had seen the Brandon Brown video.  D.A. and X.A. admitted at their depositions that they thought the shirt was funny because it meant F * * * Joe Biden (D.A. Dep. at 11-12 PageID.404; X.A. Dep. at 9 PageID.411).  Defendant Buikema testified that he understood Let's Go Brandon to mean F * * * Joe Biden (Buikema Dep. at 52 PageID.429).  Buikema had the students change their attire because the phrase violated

---

[6]      The Court does not conclude that Let's Go Brandon can be regulated as offensive speech. *See Morse*, 551 U.S. at 409 (questioning whether student speech can be regulated because the message might be offensive to some).  Nor does the Court conclude that the phrase constitutes lewd speech.

the school's dress code provision concerning profanity (*id.* at 51-52 PageID.429).  Defendant Bradford testified that she learned from other teachers that Let's Go Brandon means F*** Joe Biden (Bradford Dep. at 26-27 PageID.444).  Bradford also testified that she thought the phrase violated the dress code as lewd, vulgar and profane and generally inappropriate for middle school (*Id.* at 36-38 PageID.446-47).

A school can certainly prohibit students from wearing a shirt displaying the phrase F*** Joe Biden.  Plaintiffs concede this conclusion (ECF No. 39 PageID.554; ECF No. 44 PageID.791).  Plaintiff must make this concession as the Supreme Court said as much in *Fraser.  Fraser*, 478 U.S. at 682-83 ("As cogently expressed by Judge Newman, 'the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.") (citing *Thomas v. Bd. of Educ., Grandville Cent. Sch. Dist.*, 607 F.2d 1043, 1057 (2d Cir. 1979)).[7]  The relevant four-letter word is a swear word and would be considered vulgar and profane.  The Sixth Circuit has written that "it has long been held that despite the sanctity of the First Amendment, speech that is vulgar or profane is not entitled to absolute constitutional protection."  *Bonnell v. Lorenzo*, 241 F.3d 800, 821 (2001).  Schools have restricted student apparel containing vulgarity and profanity even when the content of the message is consistent with at least part of the schools' educational mission.  *See, e.g,. Broussard v. Sch. Bd. of City of Norfolk*, 801 F. Supp. 1526, 1527 (E.D. Va. 1992) (suspending a middle school student for refusing to change out of a New Kids on the Block

---

[7]       In his concurring opinion, Judge Newman referred to a jacket worn by Robert Cohen who was convicted for disturbing the peace by offensive conduct when he wore, to the courthouse, a jacket bearing the words "F*** the Draft."  *See Cohen v. California*, 403 U.S. 15, 16 (1971).  The Supreme Court reversed the judgment as inconsistent with the First and Fourteenth Amendments. *Id.* at 26.

concert shirt that includes the words "Drugs Suck!"); *Pyle v. South Hadley Sch. Comm.*, 824 F. Supp. 7, 9 (D. Mass. 1993) (involving a t-shirt with the message "See Dick Drink.  See Dick Drive.  See Dick Die.  Don't Be A Dick.").

If schools can prohibit students from wearing apparel that contains profanity, schools can also prohibit students from wearing apparel that can reasonably be interpreted as profane.  Removing a few letters from the profane word or replacing letters with symbols would not render the message acceptable in a school setting.  School administrators could prohibit a shirt that reads "F#%* Joe Biden."  School officials have restricted student from wearing shirts that use homophones for profane words.  *See, e.g., Mercer v. Harr*, No. Civ. A. H-04-3454, 2005 WL 1828581 (S.D. Tex. Aug. 2, 2005) (granting summary judgment in favor the middle school when the school forbid a student from wearing a shirt that read "Somebody Went to HOOVER DAM And All I Got Was This 'DAM' Shirt.").  Defendant Bradford recalled speaking to one student who was wearing a hat that said "Fet's Luck" (Bradford Dep. at 15 PageID.441).  She thought the hat was inappropriate for school because rearranging the first letters of the two words resulted in a lewd message (*id.* at 15-16 PageID.441).  Defendant Buikema testified that he asked a student to change out of a hoodie that displayed the words "Uranus Liquor" because the message was lewd (Buikema Dep. at 23 PageID.422).  School officials could likely prohibit students from wearing concert shirts from the music duo LMFAO (Laughing My F***ing A** Off) or apparel displaying "AITA?" (Am I the A**hole?).[8]  Both letter combinations are popular acronyms containing

---

[8]     The likelihood that a student would wear a LMFAO concert shirt is small as the two musicians stopped performing together in 2012 after appearing at that year's Superbowl's halftime

profanity and are frequently used on social media.  Courts too have recognized how seemingly innocuous phrases may convey profane messages.  A county court in San Diego, California referred an attorney to the State Bar when counsel, during a hearing, twice directed the phrase "See You Next Tuesday" toward two female attorneys.[9]

Because Defendants reasonably interpreted the phrase as having a profane meaning, the School District can regulate wearing of Let's Go Brandon apparel during school without showing interference or disruption at the school.  *See Morse*, 551 U.S. at 405 ("Second, *Fraser* established that the mode of analysis set forth in *Tinker* is not absolute.  Whatever approach *Fraser* employed, it certainly did not conduct the 'substantial disruption' analysis prescribed by *Tinker*."); *Defoe*, 625 F.3d at 338; *Barr*, 538 F.3d at 563 (citing *Tinker*, 393 U.S. at 509).

## C.

Plaintiffs assert that the phrase has taken on a different meaning.  Plaintiffs argue that the phrase has become a "cleaned up [political] slogan to express displeasure with President Biden and his administration" citing a November 15, 2021, article from the Washington Post written by Annie Linskey titled "How 'Let's Go Brandon' became an unofficial GOP slogan" (ECF No. 39 PageID.539).  Plaintiffs offer evidence to show widespread use of the phrase

---

show.  However, both LMFAO and LMAO are acronyms frequently used in text messages, something courts have been asked to consider.  *See, e.g.,* In *Longoria v. San Benito Consol. Indep. Sch. Dist.*, 942 F.3d 258 (5th Cir. 2019) (involving student text messages and resolving the First Amendment claim on qualified immunity grounds).  AITA? is a popular forum on the Reddit website.  The Court is unaware of any court opinions involving AITA? apparel but notes that shirts with the acronym are available for purchase on multiple websites.

[9]      *See*   https://www.calbar.ca.gov/portals/0/documents/Minute-Order-Scott.pdf   (last visited August 16, 2024).  The first two words of the four-word phrase sound like the letters "C" and "U." Adding the first two letters of the last two words in the phrase creates a four-letter vulgar insult.

including use of the slogan on a variety of merchandise, use of the phrase by three members of the House of Representatives, and its use on both television and radio.  D.A. testified that he thought the sweatshirt was funny because "it was a respectful way of saying that you dislike the current president" (D.A. Dep. at 11 PageID.404).  Both D.A. and X.A. submitted affidavits stating that they thought they "want to use the slogan to respectfully express opposition to President Biden and his administration without using profanity or vulgarity" (ECF No. 39-2 D.A. Aff. PageID.580; ECF No. 39-3 X.A. Aff. PageID.584).

Plaintiffs have not established that Let's Go Brandon does not mean F * * * Joe Biden. More specifically, Plaintiffs have not established that Buikema's and Bradford's interpretation of Let's Go Brandon was not reasonable.  Most of what Plaintiffs reference in their briefs establishes that people use the phrase.  The slogan's popularity, however, does not provide much, if any, insight about the intended meaning of the phrase by its users or how the audience interprets the phrase.

Importantly, none of the examples offered by Plaintiffs concerns the display or use of the phrase in a school setting.  In its student speech opinions, the Supreme Court has emphasized the legal principle that "'the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings.'" *Morse*, 551 U.S. at 404-05 (quoting *Fraser*, 478 U.S. at 682).  Part of a public education includes "inculcat[ing] the habits and manners of civility[.]" *Fraser*, 403 U.S. at 681 (citation omitted).  The freedom to express "unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interests in teaching students the boundaries of socially appropriate behavior." *Id.*  Specifically, "[t]he determination of what manner of speech in

the classroom or in school assembly is inappropriate properly rests with the school board."
*Id.* at 683.   Consistent with the First Amendment, a school may prohibit student apparel bearing "symbols and words that [ ] are patently contrary to the school's educational mission[.]"   *Boroff v. Van Wert City Bd. of Educ.*, 220 F.3d 465, 471 (6th Cir. 2000) (affirming a decision granting summary judgment in favor of the school defendants who prohibited a student from wearing Marilyn Manson t-shirts to school because the music group promoted destructive conduct and  demoralizing values).   The examples of the use of Let's Go Brandon outside of the school setting does not undermine the reasonableness of Defendants' interpretation of the phrase.

The only evidence Plaintiffs offer to support the conclusion that the phrase has taken on a different meaning is found in the article from the Washington Post.[10]  The article quotes former press secretary Sean Spicer who says that the slogan can be used to express all of the frustrations people have about the Biden Administration.  But, Spicer admits that the phrase has several meanings.  The author observes that the phrase is an "inside joke" used to "insult the administration" using "language designed to conceal an expletive."  The author notes that least one company removes the phrase from users' online profiles because the phrase is divisive.   The article likely offers more support for the reasonableness of Defendants' interpretation of the phrase than it does for Plaintiffs' interpretation.  D.A.'s and X.A.'s intent to be respectful and avoid the use of profanity does not change the outcome.  Their intent

---

[10]       https://www.washingtonpost.com/politics/lets-go-brandon-republicans/2021/11/14/52131dda-4213-11ec-9ea7-3eb2406a2e24_story.htm.
For the purpose of this opinion only, the Court sets aside any concerns about the admissibility of this article at a trial, including any of the statements made in the article.

does not establish how the message would be interpreted by others.  And, in *Morse*, the Supreme Court rejected the plaintiff's motive as controlling when the principal's interpretation of the banner was reasonable.  *Morse*, 551 U.S. at 401.

Plaintiffs have not persuaded the Court that Defendants cannot restrict use of the disputed phrase because none of the three words, considered separately, are profane.  The Court declines to read *Fraser* so narrowly.  Matt Fraser's speech was lewd through his use of "pervasive sexual innuendo."  *Fraser*, 478 U.S. at 683.  The audience understood his message was not really about supporting a candidate for student vice president.  Plaintiffs must concede that the disputed phrase requires interpretation.  The phrase means something other than the dictionary definition of the three words.  D.A. and X.A. are not enthusiastic supporters of someone named Brandon.  Albeit using different words, Let's Go Brandon, means F*** Joe Biden, a personal insult containing a swear word.  Defendants both interpreted the phrase as having a profane meaning.  Both D.A. and X.A. thought the phrase was a funny because it meant a profanity.  When students use language in a school setting that can reasonably be interpreted as inappropriate, courts have permitted schools to discourage students from using that language.  *See, e.g. Doninger v. Neihoff*, 527 F.3d 41, 48 (2d Cir. 2008) (involving a student who called school administrators "douchebags").  The undeniable connection between Let's Go Brandon and F*** Joe Biden distinguishes Plaintiffs' apparel from the shirt in *Guiles ex rel. Guiles*, v. Marineau, 461 F.3d 320, 322 (2d Cir. 2006) calling President George W. Bush a crook, cocaine addict, draft dodger and lying drunk driver.

Plaintiffs' restrictive interpretation of the holding in *Fraser* ignores how language works and how courts have treated messages with profane meanings.  Words constitutes profanity because of the meaning conveyed, not because of the specific letters used to form the word.  Under Plaintiff's approach, a school could not discipline a student for calling a teacher a "cretinous onager" or for telling the principal to "ingest fecal matter and pass away." Neither combination of words contains a swear word, but both word combinations would convey profane content.  And directing the words toward a political figure instead of a teacher or principal does not make the content less profane.

Finally, Plaintiffs urge the Court to follow the Third Circuit's holding in *B.H. v. Easton School District*.  Restricting the scope of the holding in *Fraser*, the Third Circuit identified a novel category of student speech protected by the First Amendment: "We hold that, under *Fraser*, a school may also categorically restrict speech that—although not *plainly* lewd, vulgar, or profane—could be interpreted by a reasonable observer as lewd, vulgar, or profane so long as it could not also plausibly be interpreted as commenting on a political or social issue." *Id.* at 302.  The Court declines Plaintiffs' invitation.  For the reasons explained above, Defendants' reasonably interpreted Let's Go Brandon as having a profane meaning. In a middle school, the phrase enjoys no more First Amendment protection that Matt Fraser's nominating speech—none at all.

In the more than ten years since the *B.H.* opinion issued, no other circuit court has adopted the Third Circuit's new category of student speech.  The Third Circuit relied on Justice Alito's concurring opinion to reach its holding.  *Id.* at 309-15; *see also Morgan*, 659 F.3d at 403 (referring to Justice Alito's concurrence as the "controlling opinion").  The

Seventh Circuit, however, has rejected the argument that Justice Alito's concurrence controls the proper interpretation of *Morse*.  *See Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 673 (7th Cir. 2008).  And, as pointed out by the dissent in *B.H.*,

> nine of ten appellate courts have cited as its holding the following standard articulated by Chief Justice Robers in his opinion for the Court: "[A] principal may, consistent with the First Amendment, restrict student speech at a school event, when that speech is reasonably viewed as promoting illegal drug use," *Morse*, 551 U.S. at 403.  Not one of these courts indicated that Justice Alito's concurrence controls, or that his dicta regarding "political or social speech" altered or circumscribed the Court's holding in *Morse*.

*B.H.*, 725 F.3d at 328 (Hardiman, J. dissenting); *see, e.g., Defoe*, 625 F.3d at 332-33.

This Court agrees that political expression, the exchange of ideas about the governance of our county, deserves the highest protection under the First Amendment.  *See Snyder v Phelps*, 562 U.S. 443, 452 (2011).  But Plaintiffs did not engage in speech on public issues.  Defendants reasonably interpreted Let's Go Brandon to F*** Joe Biden, the combination a politician's name and a swear word—nothing else.  Hurling personal insults and uttering vulgarities or their equivalents towards one's political opponents might have a firm footing in our nation's traditions, but those specific exchanges can hardly be considered the sort of robust political discourse protected by the First Amendment.  As a message, F*** Joe Biden or its equivalent does not seek to engage the listener over matters of public concern in a manner that seeks to expand knowledge and promote understanding.  When teachers and officials at a middle school reasonably determine that a message conveys profanity, *Morse* requires deference to that interpretation.

### D.

Accordingly, the Court finds that Defendants did not violate D.A.'s or X.A.'s First Amendment rights when Defendants restricted Plaintiffs' ability to wear Let's Go Brandon apparel. The clothing contained a message with a profane meaning. Applying the reasonable interpretation standard in *Morse* with the school's authority to restrict profane messages in *Tinker*, Defendants are entitled to summary judgment on Counts I and III.[11] Defendants are also entitled to summary judgment on Count II. For a *Monell* claim, "there can be no liability ... without an underlying constitutional violation." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014).

### VII.

In school settings, profanity does not enjoy First Amendment protection. Directing profanity toward a political figure does not transform the utterance to protected speech. Indisputably, the phrase Let's Go Brandon originated as a profane personal insult directed at President Joe Biden. When Plaintiffs wore sweatshirts bearing the phrase to their middle school, school officials reasonably interpreted the phrase as having a profane meaning. The school officials then enforced the dress code and had Plaintiffs change their attire. The school's actions did not violate Plaintiffs' First Amendment rights.

---

[11]     Having found no constitutional violation, Defendants' request for qualified immunity becomes moot. *See Adams v. City of Auburn Hills*, 336 F.3d 515, 520 (6th Cir. 2003) ("Because the Fourth Amendment is not implicated, Adams has not alleged a constitutional violation to support a § 1983 claim. Without an underlying constitutional violation, the question of whether Backstrom is entitled to qualified immunity is moot."); *Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1999) ("As we hold that sufficient probable cause existed, this necessarily means that the arrest complied with constitutional requirements and that Ahlers was not deprived of a constitutional right. As a result, there is no claim under § 1983, and Defendants have no need for a qualified immunity defense.").

## ORDER

For the reasons outlined in the accompanying Opinion, the Court **GRANTS** Defendants' motion for summary judgment (ECF No. 38) and **DENIES** Plaintiffs' motion for summary judgment (ECF No. 39).  **IT IS SO ORDERED.**

Date:    August 23, 2024                              /s/  Paul L. Maloney
                                                  Paul L. Maloney
                                                  United States District Judge